# THE SUPREME COURT, STATE OF WYOMING

# 2023 WY 27

APRIL TERM, A.D. 2023

April 4, 2023

BOARD OF PROFESSIONAL
RESPONSIBILITY, WYOMING STATE
BAR,

Petitioner,

v.

LEIGH ANNE G. MANLOVE, WSB #6-3441,

Respondent.

D-20-0009

*Original Proceeding for Attorney Discipline*

*Representing Appellant:*
Weston W. Reeves, Special Bar Counsel, Wyoming State Bar.

*Representing Appellee:*
D. Stephen Melchior of Melchior Law Firm, P.C., Cheyenne, Wyoming.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]    The Wyoming State Bar (Bar) charged attorney Leigh Anne G. Manlove (Ms. Manlove) with violations of the Wyoming Rules of Professional Conduct for Attorneys at Law (W.R.P.C., Rule, or Rules) (LexisNexis 2022) for her acts and omissions while serving as the Laramie County District Attorney.  A Hearing Panel from the Bar's Board of Professional Responsibility conducted a hearing and submitted to this Court a report and recommendation for disbarment pursuant to the Wyoming Rules of Disciplinary Procedure (W.R.D.P.) 15(b)(3)(F) (LexisNexis 2022).  Ms. Manlove objected to the report and recommendation.  Having reviewed the entire record, including the exhibits and depositions that were admitted into evidence, and considered the arguments by Ms. Manlove and Special Bar Counsel, we find Ms. Manlove should be disbarred from the practice of law in Wyoming.

## JURISDICTION AND STANDARD OF REVIEW

[¶2]    "[T]his Court has 'the power, the duty, and the corresponding jurisdiction to supervise the conduct of all Wyoming attorneys, each of whom is an officer of the court.'" *Bd. of Pro. Resp. v. Hinckley*, 2022 WY 18, ¶ 2, 503 P.3d 584, 592–93 (Wyo. 2022) (quoting *Meyer v. Norman*, 780 P.2d 283, 288 (Wyo. 1989)).  Wyoming Statutes charge this Court with establishing the "practice and procedure for disciplining, suspending, and disbarring attorneys." *Hinckley*, 2022 WY 18, ¶ 2, 503 P.3d at 592 (quoting Wyo. Stat. Ann. § 5-2-118(a)(iii) (LexisNexis 2021)).  Attorney disciplinary proceedings are initiated by the Wyoming State Bar when Bar counsel files formal charges with the Board of Professional Responsibility (BPR). W.R.D.P. 13(a).  Upon the filing of a formal charge, a hearing panel is appointed to conduct a hearing. W.R.D.P. 15(a)(2).  If after receiving evidence, the hearing panel finds Bar counsel proved the formal charges by clear and convincing evidence and public censure, suspension, or disbarment is warranted, it is required to file with this Court a report and recommendation with its findings of fact and conclusions of law. W.R.D.P. 6(c)(4); W.R.D.P. 15(b)(3)(E).

[¶3]    Inherent in this Court's power is the duty and authority to review a report and recommendation for sanction of a Wyoming attorney. Wyo. Stat. Ann. § 5-2-118(a)(iii); W.R.D.P. 1(d); W.R.D.P. 16(a); *Hinckley*, 2022 WY 18, ¶ 2, 503 P.3d at 593 (quoting *State Bd. of Law Examiners v. Brown*, 53 Wyo. 42, 49, 77 P.2d 626, 628 (1938)).  "The purposes of the state bar disciplinary procedures are to maintain the integrity of the bar, to prevent the transgressions of an individual lawyer from bringing its image into disrepute and to protect the public and the administration of justice." *Hinckley*, 2022 WY 18, ¶ 3, 503 P.3d at 593 (*quoting Bd. of Pro. Resp. v. Richard*, 2014 WY 98, ¶ 51, 335 P.3d 1036, 1051 (Wyo. 2014)).  "[T]he responsibility of this Court is not to punish, but to inquire into and gauge a lawyer's continued fitness to practice law." *Hinckley*, 2022 WY 18, ¶ 3, 503 P.3d at 593.  We conduct our review with a focus on "safeguarding the interests of the public, the courts, and the legal profession." *Hinckley*, 2022 WY 18, ¶ 3, 503 P.3d at 593.

[¶4]    Our standard of review of a report and recommendation for discipline is set forth in W.R.D.P. 16(b):

> The Court will give due consideration to the findings and recommendations of the Hearing Panel, but the ultimate judgment in proceedings under these rules is vested in the Court. Accordingly, the Court will examine the evidence, make findings, determine whether there has been an infraction of the Wyoming Rules of Professional Conduct, and impose the discipline which the Court considers appropriate.

[¶5]    We conduct a de novo review of all aspects of attorney discipline. *Hinckley*, 2022 WY 18, ¶ 4, 503 P.3d at 593 (quoting *Bd. of Pro. Resp. v. Custis*, 2015 WY 59, ¶ 36, 348 P.3d 823, 832 (Wyo. 2015)).   We are not required to adopt the BPR's report and recommendation. *Id.*  Instead, we may make our own findings based on the record before us. *Id.*  "We bear the ultimate responsibility for deciding whether misconduct has occurred and, if so, what discipline is warranted." *Id.*

[¶6]    Our review is limited to the formal charge and those charges which an attorney was provided notice of the facts alleged to constitute misconduct and the alleged Rule(s) violated. *Hinckley*, 2022 WY 18, ¶¶ 7–9, 503 P.3d at 594–95; W.R.D.P. 13(a) ("[A] formal charge . . . shall set forth clearly and with particularity the grounds for discipline with which the respondent is charged and the conduct of the respondent which gave rise to those charges.").   Bar counsel must prove an alleged violation of the Rules by clear and convincing evidence. W.R.D.P. 15(b).  "Clear and convincing evidence is 'that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable.'" *Bd. of Pro. Resp. v. Stinson*, 2014 WY 134, ¶ 29, 337 P.3d 401, 409 (Wyo. 2014) (quoting *In re SMH v. State*, 2012 WY 165, ¶ 19, 290 P.3d 1104, 1109 (Wyo. 2012)).

[¶7]    We are not bound by the BPR's findings of fact, view of the evidence, or credibility determinations, "although we give due consideration to those findings . . . ." *Hinckley*, 2022 WY 18, ¶ 4, 503 P.3d at 593 (*State ex rel. Okla. Bar Ass'n v. Moon*, 2012 OK 77, ¶ 6, 295 P.3d 1, 5 (Okla. 2012)).   The BPR made several credibility findings in its report and recommendation.  After reviewing the record, we find no reason to depart from the BPR's credibility findings.   Particularly, we find several of Ms. Manlove's statements were misleading and contradicted by the testimony, depositions, and the exhibits she admitted into the record.

## STATEMENT OF THE CASE

[¶8]    Ms. Manlove obtained her license to practice law in Wyoming in 2000.  She was elected to serve as the District Attorney for Laramie County, Wyoming, and assumed office

2

on January 7, 2019. Beginning in the fall of 2019, staff employed at the Laramie County District Attorney's Office (D.A.'s Office) began reporting concerns about Ms. Manlove's conduct to Bar Counsel and to the Human Resources Division with the Department of Administration & Information (Human Resources Division).

[¶9]  More than a year later, on December 21, 2020, the circuit court and district court judges in Laramie County jointly wrote a letter reporting Ms. Manlove's conduct to the Bar. The judges stated they collectively witnessed Ms. Manlove refuse to fulfill her ethical obligations, and they believed the Wyoming Judicial Code of Conduct required them to report her conduct to the Bar for an investigation. The judges' reported concerns about Ms. Manlove's conduct were two-fold: (1) her personnel management; and (2) abdicating her professional responsibilities. After receiving the judges' letter, Bar Counsel filed a request for this Court to immediately suspend Ms. Manlove's license pursuant to W.R.D.P. 17(a). We denied the request.[1]

[¶10]  Following the denial, Special Bar Counsel continued to investigate the concerns and filed two formal charges against Ms. Manlove with the BPR. The first formal charge was filed on June 11, 2021, and the second formal charge was filed approximately four months later. The two formal charges were consolidated upon Ms. Manlove's request. The Hearing Panel held an eight-day hearing.

[¶11]  On March 11, 2022, the Hearing Panel filed its findings of fact, conclusions of law and recommendation with this Court.[2] The Hearing Panel recommended Ms. Manlove be disbarred from the practice of law in Wyoming. It further recommended imposing certain fees and costs. Ms. Manlove objected to the recommendation. The issue before this Court is whether Ms. Manlove violated any of the Wyoming Rules of Professional Conduct, and if she did, what sanction should be imposed.

## DISCUSSION OF FORMAL CHARGES

[¶12]  In the two formal charges, Special Bar Counsel alleged Ms. Manlove's actions or inactions in Docket No. 34-280 (*State v. R.L.*), Cheyenne Police Department Case No. 20-47759, BPR docket number 2021-005, BPR docket number 2021-039, Criminal Action No. CR 2019-1739, and in her personnel management and case management, violated several Rules. We find Ms. Manlove's acts or omissions in *State v. R.L.*, Cheyenne Police Department Case No. 20-47759, Criminal Action No. CR 2019-1739, and her case management violated Rules 1.1, 1.3, 3.3(a), 3.4(c), 8.1(a), and 8.4(d).[3]

---

[1] *BPR v. Manlove*, D-20-0009 (Jan. 26, 2021) (order denying petition for immediate suspension).

[2] *BPR v. Manlove*, D-20-0009 (March 11, 2022) (Wyoming Board of Professional Responsibility Hearing Panel's findings of fact, conclusions of law and recommendation).

[3] We make no findings as to paragraph 30 in the first formal charge. In paragraph 30 of the first formal charge, Special Bar Counsel alleged Ms. Manlove violated the Rules by her actions in *Armajo v. State*,

3

## I. BPR Docket No. 2021-62: Docket No. 34-280, *State v. R.L.*

[¶13] Regarding Ms. Manlove's acts and omissions in *State v. R.L*, the Hearing Panel found she violated her duty of competence under Rule 1.1, her duty of diligence under Rule 1.3, and her duty of fairness to the opposing party under Rule 3.4(c) by failing to collect and produce evidence to defense counsel in compliance with a court order. It also found Ms. Manlove violated her duty of candor to the tribunal under Rule 3.3(a) "by misrepresenting the reason for her failure to comply with court ordered discovery." The Hearing Panel further found Ms. Manlove violated Rule 8.4(d) because her failure to produce evidence resulted in the dismissal of *State v. R.L.* with prejudice.

[¶14] Ms. Manlove admits she violated Rules by missing a discovery deadline but claims she was already sanctioned through the district court's dismissal of the matter. Sanctions imposed by the district court for violations of the discovery rules are separate and distinct from any disciplinary action by the BPR or this Court for a violation of the Wyoming Rules of Professional Conduct. *See generally Bd. of Pro. Resp. v. Chapman*, 2007 WY 8, 150 P.3d 182, 183–84 (Wyo. 2007) (imposing a public censure for violation of the Rules after the district court-imposed sanctions in the underlying litigation); Mark W. Gifford, *Discovery Violations and Lawyer Discipline*, 36 Wyo. Law. 14, 15 (Feb. 2013) ("Lawyers who do not follow the discovery rules risk sanctions by the trial court as well as disciplinary action by the Board of Professional Responsibility and the Wyoming Supreme Court."). If Ms. Manlove violated the Rules with her acts or omissions in *State v. R.L.*, she is subject to further discipline by this Court. We review whether Ms. Manlove violated Rules 1.1, 1.3, 3.4(c), or 3.3 (a). Our review on whether Ms. Manlove violated Rule 8.4(d) is discussed below in sub-section V(B).

### A. Facts Relevant to Alleged Misconduct in *State v. R.L.*

[¶15] Approximately one month before Ms. Manlove assumed office, R.L. was charged with five criminal counts: (1) first-degree sexual assault; (2) strangulation of a household member; (3) kidnapping; (4) domestic battery on a household member; and (5) misdemeanor property destruction. R.L. was charged as a habitual criminal because he allegedly had three or more prior violent felony convictions, which included unlawful use of a weapon; second-degree sexual assault; burglary; and distribution, delivery, or manufacturing of a controlled substance.

---

2020 WY 153, 478 P.3d 184 (Wyo. 2020). In answering the formal charge, Ms. Manlove admitted the allegations related to *Armajo*, but alleged the claim was irrelevant and barred by the doctrine of res judicata. There was no evidence presented on this issue at the disciplinary hearing and the Hearing Panel made no findings on this claim. We therefore decline to address this matter on review. *See Hinckley*, 2022 WY 18, ¶¶ 8–9, 503 P.3d at 594–95.

[¶16] R.L. was arraigned after Ms. Manlove assumed office. The district court entered a criminal case management order, which required: "(a) both parties to act promptly and professionally with respect to their respective discovery obligations; (b) the Defendant to timely file a demand or motion for discovery under [Wyoming Rules of Criminal Procedure] 16(a) and 26.2 [("W.R.Cr.P.") (LexisNexis 2018)]; (c) the State to respond within ten days of Defendant's demand, and (d) the parties to submit [p]retrial [m]emoranda no later than fifteen days before the scheduled trial." R.L. filed demands for discovery and witness statements, which "specifically requested notice of evidence the State intended to use at trial, as well as any results or reports of scientific tests or experiments which are material to the preparation of a defense." Upon the filing of R.L.'s demands, the district court entered an order requiring the State to "produce for the examination . . ., any written or recorded statement of a witness other than the defendant . . . which [the State] may reasonably obtain which relates to the subject matter about which the witness has testified or will testify[.]" W.R.Cr.P. 26.2(a).

[¶17] More than two months later, on March 28, 2019, the district court held a scheduling conference. At the scheduling conference, R.L.'s counsel requested to move the trial to the May stack to allow preparation of the defense. Ms. Manlove informed the district court she recently received the DNA test results from the Wyoming State Crime Lab ("Crime Lab"), but she had not yet provided those results to the defendant. In response, R.L.'s counsel asked for a June trial date because he was not aware there was DNA evidence, and he would need time to review that evidence. The district court reset the trial for June 17, 2019.

[¶18] Less than a month before trial, on May 21, 2019, R.L.'s counsel was at the D.A.'s Office on unrelated cases when Ms. Manlove's legal assistant provided him with a disc containing discovery in R.L.'s matter. Ms. Manlove's legal assistant "informed defense counsel that the same discovery information [on] the provided disc would be placed on the server that same day." The server is an electronic system where the D.A.'s Office uploads discovery for defense counsel to access and download. The discovery provided to R.L.'s counsel and uploaded to the server did not include the DNA test results referenced during the scheduling conference.

[¶19] R.L.'s counsel filed a motion to exclude the evidence, including the undisclosed DNA test results, due to Ms. Manlove's late disclosure. Specifically, with regard to the DNA test results and R.L.'s prior criminal record, R.L.'s counsel stated:

> 25. Counsel for Defendant has still yet to receive discovery pertaining to Defendant's prior record as well as DNA/Biological information from the State. Counsel has previously made demands for such as outlined in this motion and the State has even informed the court and counsel on March 28, 2019, that the State was in possession of DNA

5

evidence in this matter and promised to provide such to counsel for Defendant.

26. . . . . Counsel cannot make meaningful the discovery provided on May 21, 2019 without the DNA/Biological evidence the State has asserted to be in their possession and cannot adequately prepare a defense or provide effective assistance of counsel without the promised DNA evidence or even Defendant's prior record given the allegations in this matter. Without additional evidence pertaining to DNA swabs taken of Defendant and their relevance to SANE exams/reports, counsel for Defendant is left in the dark as to the totality of the evidence against the Defendant, or in favor of Defendant, resulting in the prejudice described . . . as a result of the discovery violation and violation of the court's Criminal Case Management Order.

[¶20] Six days after the filing of his motion and only two weeks before trial, Ms. Manlove provided R.L.'s counsel with the DNA test results she mentioned months earlier during the scheduling conference. While Ms. Manlove provided the DNA test results, she did not provide what is referred to in the record as the "litigation support package." The litigation support package consists of "the lab analyst['s] notes, the analyst['s] CV, the lab accreditation information" and the experimental analysis and assessment of the test results. In Ms. Manlove's own words, the litigation support package includes "the additional DNA evidence that [R.L.'s counsel] needs for his experts and in order to prepare for his client's case." The litigation support package was necessary to aid in R.L.'s defense by providing potentially exculpatory information, or details that could possibly render the results inadmissible at trial.

[¶21] The district court held a hearing on R.L.'s motion to exclude on June 6, 2019. At the hearing, Ms. Manlove advised the district court she could have filed a motion to dismiss within the bounds of criminal procedure "that would have obviated [the] hearing." She then went on to describe the server used by the D.A.'s Office to provide discovery to defense counsel. Ms. Manlove explained any notice regarding the availability of evidence from the Crime Lab is not provided to her office, but instead is sent to the submitting agency—the Cheyenne Police Department in this instance. She further contended she still did not have the litigation support package, but she would "certainly . . . request it."

[¶22] Ms. Manlove admitted she had a duty to provide the discovery, and she should have provided the discovery much earlier under the criminal management order and the Rules of Criminal Procedure. She admitted it was "pretty far into the game to request [the litigation support package] and be able to analyze it." Ms. Manlove "recognize[d] that because of the failures by [her] office[,] the [c]ourt [was] in a very difficult position. But

6

[she] want[ed] the [c]ourt to know" if the motion to exclude was granted she would file a motion to dismiss the case.

[¶23]  The district court granted R.L.'s motion but did not find Ms. Manlove acted in bad faith when she failed to timely produce the evidence.  Instead, the district court held "it was the result of oversight, negligence, sloppiness, and/or lack of due diligence."  The day before the trial was scheduled to begin, Ms. Manlove moved to dismiss the matter without prejudice.  Her motion contended the State could not meet its burden.  The district court granted the motion but dismissed the matter with prejudice.

## B. Violations of the Duty of Competence, Rule 1.1, and the Duty of Diligence, Rule 1.3

[¶24]  The Hearing Panel found Ms. Manlove's failure to timely disclose evidence violated her duties of competence and diligence under Rules 1.1 and 1.3.  Rule 1.1 requires a lawyer to provide competent representation.  "Competent representation requires the . . . thoroughness and preparation reasonably necessary for the representation." W.R.P.C. 1.1. Thoroughness and preparation "include[] inquiry into and analysis of the factual and legal elements of the problem [and] adequate preparation." W.R.P.C 1.1 cmt. 4.  Rule 1.3 requires a district attorney to "act with reasonable diligence and promptness" in "prosecuting, investigating, and representing the State of Wyoming in all criminal matters." W.R.P.C. 1.3; *Elliott v. State*, 2011 WY 32, ¶ 8, 247 P.3d 501, 504 (Wyo. 2011) (citing Wyo. Stat. Ann. §§ 9–1–801, 9–1–804 (LexisNexis 2009)); *see also Diligence, Promptness and Punctuality*, ABA Standards for Criminal Justice § 3-1.9 (4th ed. 2015) ("The prosecutor should act with diligence and promptness to investigate, litigate, and dispose of criminal charges, consistent with the interests of justice and with due regard for fairness, accuracy, and rights of the defendant, victims, and witnesses.").

[¶25]  Ms. Manlove, as the district attorney, was obligated to "know and comply with timing requirements applicable to a criminal investigation and prosecution, so as to not prejudice a criminal matter." ABA Standards for Criminal Justice § 3-1.9; *Wilks v. State*, 2002 WY 100, ¶ 27, 49 P.3d 975, 986–87 (Wyo. 2002) (analyzing the defendant's claims against the prosecutor according to the ABA Standards for Criminal Justice).  She had "an affirmative duty . . . to learn of favorable evidence in the State's control and divulge such evidence to the defendant" to safeguard the defendant's constitutionally guaranteed access to evidence and his constitutionally protected right to present a defense. *Chauncey v. State*, 2006 WY 18, ¶ 13, 127 P.3d 18, 21–22 (Wyo. 2006); *Kovach v. State*, 2013 WY 46, ¶ 50, 299 P.3d 97, 112 (Wyo. 2013); *Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S. Ct. 333, 336, 102 L. Ed. 2d 281 (1988).  When R.L.'s counsel filed a written demand for the production of R.L.'s prior criminal record and for any physical and scientific examinations, Ms. Manlove through the exercise of due diligence was required to gather and produce such evidence. W.R.Cr.P. 16(a)(1)(B)(D); *Kovach*, ¶ 50, 299 P.3d at 112; *Chauncey*, ¶ 13, 127 P.3d at 21–22.

[¶26]  R.L. was charged as a habitual criminal under Wyoming's habitual criminal statute, Wyoming Statute § 6-10-201(a).  "[T]he intent behind Wyoming's habitual criminal statute is to provide enhanced punishment to an individual who has engaged in a pattern of violent criminal conduct." *Harris v. State*, 2015 WY 50, ¶ 11, 346 P.3d 944, 946 (Wyo. 2015); Wyo. Stat. Ann. § 6-10-201.  On June 5, 2019, Ms. Manlove's pretrial memorandum, which was dilatorily filed twelve days before trial in violation of the criminal management order, did not list any witnesses or exhibits relating to R.L.'s prior criminal record.  As of that date, she had not produced documentary evidence about R.L.'s prior criminal record though she was mandated to do so. W.R.Cr.P. 16(a)(1)(B).

[¶27]  Although Ms. Manlove did not list any witnesses with respect to R.L.'s prior criminal record in her pretrial memorandum, she did list the forensic analysts from the Crime Lab as witnesses.  In March 2019, Ms. Manlove told the district court at the scheduling conference she had received the Crime Lab's DNA test results.  However, she did not disclose those test results for another two months, which was 14 days before trial. At the very least, Ms. Manlove should have disclosed the DNA test results to R.L.'s counsel when she learned of their existence.

[¶28]  Ms. Manlove's failure to disclose R.L.'s prior criminal record and the DNA test results shows a lack of thoroughness and preparation reasonably necessary for the prosecution of R.L.  It further shows a disregard of the duty to "act with reasonable diligence and promptness" in "prosecuting, investigating, and representing the State of Wyoming." *See* W.R.P.C. 1.3; *Elliott*, 2011 WY 32, ¶ 8, 247 P.3d at 504.  Additionally, Ms. Manlove's failure to disclose evidence and timely file her pretrial memorandum violated her duties of diligence and competence.  Ms. Manlove failed to act with reasonable competence and diligence, which led to the dismissal of serious criminal allegations with prejudice and foreclosed the State's ability to prosecute an alleged habitual offender under these allegations.  We agree with the Hearing Panel and find there is clear and convincing evidence Ms. Manlove violated Rules 1.1 and 1.3 by failing to comply with a court order and by failing to collect, review, and disclose all available evidence.

## C. Fairness to Opposing Party and Counsel, Rule 3.4(c)

[¶29]  The Hearing Panel found Ms. Manlove's failure to timely disclose evidence also violated her duty to be fair to the opposing party and counsel.  Under Rule 3.4(c), "[a] lawyer shall not knowingly disobey an obligation under the rules of a [court]." W.R.P.C. 3.4(c); W.R.P.C. 1.1(n) (defining a tribunal to include a court).  "'[K]nowingly' denotes actual knowledge of the fact in question." W.R.P.C. 1.0(g).  An attorney violates Rule 3.4(c) when clear and convincing evidence shows the attorney violated an obligation under the Wyoming Rules of Criminal Procedure with awareness, deliberateness, or intention. *See generally Hinckley*, 2022 WY 18, ¶¶ 37–38, 503 P.3d at 602 (defining knowingly violating Rule 3.3(a)).  Ms. Manlove admitted she was required to timely disclose evidence

and acknowledged the case management order required her to disclose evidence much earlier than she did. Ms. Manlove admitted in an email she sent to the Cheyenne Police Department she failed to timely provide discovery in her possession. She further stated at the disciplinary hearing she took full responsibility for the discovery violations. We find there is clear and convincing evidence she knowingly disobeyed the district court's case management order and failed to disclose evidence pursuant to the Rules of Criminal Procedure. We agree with the Hearing Panel and find Ms. Manlove violated Rule 3.4(c).

## D. Duty of Candor to the Tribunal, Rule 3.3(a)

[¶30] As a third violation, the Hearing Panel found Ms. Manlove violated her duty of candor by misrepresenting to the district court her reason for failing to timely disclose the DNA evidence. Under Rule 3.3(a), "[a] lawyer shall not knowingly make a false statement of material fact or law to a [court] or fail to correct a false statement of material fact or law previously made to the [court] by the lawyer[.]" An attorney violates Rule 3.3(a) "when clear and convincing evidence shows [s]he provided false facts to the court with awareness of their falsity." *Hinckley*, 2022 WY 18, ¶ 38, 503 P.3d at 602 (citing *Att'y Grievance Comm'n of Md. v. Dore*, 73 A.3d 161, 171 (Md. 2013)). Actual knowledge of the fact in question "may be inferred from circumstances." W.R.P.C. 1.0(g) (defining knowingly). We agree the facts and circumstances in the record show Ms. Manlove knowingly made a false statement of material fact to the district court and never corrected that false statement.

[¶31] Ms. Manlove stated to the district court during a scheduling conference on March 28, 2019:

> The only additional discovery I received in the last two days was a result from the state crime lab on the DNA. So that's obviously very important discovery for the defense, and I've not yet been able to provide that to them.

More than two months after the scheduling conference, R.L.'s counsel filed a motion to exclude the DNA test results. He informed the district court that Ms. Manlove had not disclosed the DNA test results that she previously stated were in her possession. Six days later, Ms. Manlove disclosed the DNA test results to defense counsel. That day, Ms. Manlove sent an email to the Cheyenne Police Department stating she never received notice the DNA test results were available and indicated she did not know she needed to check for the results on the Crime Lab's system (BEAST).[4] Ms. Manlove stated:

---

[4] BEAST is described in detail in sub-section II(A), (C) below. Throughout this opinion there is reference to the acronyms BEAST and LERMS. BEAST is the laboratory information system the Department of Criminal Investigation uses to upload data, test results, documents, and evidence for certain end-users, including the D.A.'s Office, to access and download information. LERMS is identified as the Law Enforcement Records Management System, which is described in detail in sub-section II(A). LERMS is

**So, in [R.L.'s] case, it turns out that the Lab had results on February 7, 2019. Which my office just learned of this morning, when I read the Motion and asked [the District Attorney investigator] to search the BEAST for any results related to the case.** The date of the reports is doubly problematic for me in that 'the State' (through the [Crime Lab] and the [Cheyenne Police Department]) knew or should have known about the results and at a March 28th hearing in this case I informed the Court and [R.L.'s counsel] that DNA evidence was obtained in the investigation and would be provided to the Defense as soon as it was received. **This makes it look like I was hiding evidence—because on March 28th 'I knew or should have known' that the DNA tests were completed and had been almost 6 weeks earlier. However, neither I nor anyone in my office was ever notified by anyone that the results were available.** To be clear—at Thursday's hearing the only person who I will name as responsible for the discovery violation is me.

(Emphasis added).

[¶32]   Ms. Manlove's assertions in her email contradict her statements to the district court two months earlier, where she admitted to having received the DNA test results. Ms. Manlove further contradicted her statements in this email during the hearing on R.L.'s motion to exclude. At that hearing, Ms. Manlove misled the district court by concealing when she actually received the DNA test results and by being evasive on when she provided them to R.L.'s counsel. Ms. Manlove told the district court:

> [THE COURT]: There's also a criminal case management order which requires it be delivered much earlier than that.
>
> [MS. MANLOVE]: Yes. The State doesn't take issue with any of that. Your Honor, that's why I'm here because it's on me.
>
> So the discovery system that we have through the Cheyenne Police Department, and it's different with each agency, the Cheyenne Police Department uploads its discovery to a server.

---

the software the Cheyenne Police Department and Laramie County Sheriff's Office use to manage and upload their evidence and documentary information. The D.A.'s Office has access to LERMS to electronically download the information. Ms. Manlove testified she was provided access to the Cheyenne Police Department's and Laramie County Sheriff's Office's records through LERMS before she assumed office.

My office is notified that that discovery is available. We download it from the server and then we upload it to another server to provide to end users, the defense bar.

\* \* \*

. . . . [I]n [R.L.'s] case specifically, this upload and download and reupload, there's no tracking mechanism. So in other words, we don't have any way of knowing -- there is no receipt, if you will, for when discovery is actually electronically provided to defense counsel and when defense counsel receives it or downloads it. As a consequence in [R.L.'s] case, when my office looked in [R.L.'s] folder, his electronic folder for discovery, it looked as though it had been provided, uploaded. **It never was until [R.L.'s counsel] was in my office and visited with my legal assistant on May 21ˢᵗ. So that is when we became aware of this first problem. So the discovery was provided late to defense counsel** . . . .

\* \* \*

In regard to what I'll just refer to broadly as DNA evidence, the best way I can explain it is I have all of the responsibility under the law to produce that evidence and none of the control of it. I don't have the physical control. And when it comes to the state crime lab, I also don't have the electronic or digital control. And by that, I mean I never collect evidence as the prosecutor. I shouldn't. Therefore, I never submit evidence. I shouldn't. Law enforcement does that. And the way the Wyoming State Crime Lab's system is set up, only the submitting agency, the submitting law enforcement personnel receives electronic or digital notification, and it's an automatically generated email, that the testing is done. That's ballistics testing, that's DNA, that's blood. Whatever it is that the law enforcement person or the agency has submitted to the crime lab, they receive an email that says in this case number from your agency this is available. And then whatever was actually tested is returned to the submitting agency, the physical evidence itself.

So I don't receive that email. I sure wish I did. **Because when I became aware of this problem with [R.L.'s] case, I asked my investigator . . . if he would go to the crime lab and see**

11

**if this report was done. And, in fact, it was done and had been for months. [R.L.'s counsel] is correct. There are two - - they call them laboratory examination reports.** One is dated December 27, 2018. There are two others both dated February 7th, 2019. And they are addressed to . . . the Cheyenne Police Department . . . evidence technician. She's the submitting agency. So she received this notice. Unfortunately, for whatever reason my office did not.

Interestingly, we've also discovered that when my office is given permission to access that Wyoming State Crime Lab digital information, we operate under a different protocol than the submitting agency. So the information that [R.L.'s counsel] was talking about earlier, the lab analyst notes, the analyst CV, the lab accreditation information, the testing, like all of the juicy good stuff that his expert needs, that is not available to my agency because we are not the submitting agency. And, in fact, it's not available to the submitting agency law enforcement unless specifically requested.

So I can ask Wyoming State Crime Lab to give me what they call a litigation support packet. And I give them the agency case number for the Cheyenne Police Department, this case, and then the laboratory case number, [R.L.'s] case as it was processed through the crime lab. When I give them that, then they will give me the litigation support packet, which is the additional DNA evidence that [R.L.'s counsel] needs for his experts and in order to prepare for his client's case.

[R.L.'s counsel] doesn't have it because I still don't have it. I certainly will request it. . . .

[¶33] During the disciplinary hearing, Special Bar Counsel asked Ms. Manlove if she had received the DNA test results prior to when she disclosed them to defense counsel in June 2019. Ms. Manlove initially testified she did not believe she had received the DNA test results. Special Bar Counsel impeached Ms. Manlove's testimony by introducing the transcript from the scheduling conference, where she stated she had received the DNA test results from the Crime Lab in March 2019. Later in the disciplinary hearing, Ms. Manlove testified she had received and reviewed the DNA test results in March 2019. Yet, during the hearing on R.L.'s motion to exclude, Ms. Manlove indicated she did not become aware of the DNA test results until after R.L.'s counsel filed the motion to exclude.

[¶34]  Ms. Manlove's testimony at the disciplinary hearing contradicted her statements to the district court.  Although Ms. Manlove's testimony was consistent with her statement to the district court at the scheduling conference, her testimony was inconsistent with her statements to the district court at the motion to exclude hearing.  After having her testimony impeached, Ms. Manlove misled the Hearing Panel by testifying R.L.'s counsel received the DNA test results before June 2019.  She testified R.L.'s motion to exclude was limited to her failure to request and produce the litigation support package, not the actual DNA test results.  She testified:

> And part of the evidence in this particular case included analysis from the Wyoming State Crime Lab.  And as we discussed when [Special Bar Counsel] and I were talking, I had that analysis in March.  I have the DNA analysis, I have the report, and it certainly indicated that there had been sexual contact between [R.L.] and the victim.  And so as we're getting closer to trial and [R.L.'s counsel] is preparing, he realizes that there is not a litigation support packet.

Ms. Manlove testified while the litigation support package was not given to R.L.'s counsel before he filed the motion to exclude, R.L.'s counsel "received [the DNA test results] . . . sometime in the spring" prior to the filing of his motion to exclude.

[¶35]  Defense counsel's statements during the motion to exclude hearing contradict Ms. Manlove's testimony.  Contrary to Ms. Manlove's assertions to the Hearing Panel, defense counsel did not limit his motion to the litigation support package.  Defense counsel stated he did not receive the DNA test results until June 3, 2019, which was after he filed his motion to exclude.  His motion stated Ms. Manlove asserted she had the DNA test results in her possession in March 2019, but she had not provided that evidence as of May 28, 2019.  R.L.'s counsel specifically requested the district court exclude the DNA test results and the litigation support package.  He stated:

> The reports in total I have are from, if I remember right, December and maybe a February period.  And they are summaries that talk about DNA being consistent in nature, how [R.L.] cannot be excluded . . . .
>
> Those reports I didn't receive from the State until June 3rd of this year.  Just this past Monday.  And it's only those six-page reports.  Never the DNA test themselves, what is commonly referred to as a DNA packet, how the testing was done, lab protocols, what fail-safes were put in place, anything along those lines.  I don't know how they got to those results.

\*　　\*　　\*

> I think the analysis is the same for what hasn't been provided
> and what is being provided as of June 3rd. Certainly, I don't
> know the reasons for the delay. I'm not going to speculate that
> it's bad faith . . . .
>
> I have no time to review what I don't have. No time to really
> make any meaningful review of the summary lab examination
> report . . . .

[¶36] Candor towards the tribunal under Rule 3.3(a) "is based on the idea that every court has the right to rely upon an attorney to assist it in ascertaining the truth of the case before it." *Att'y Grievance Comm'n of Md. v. Smith*, 442 Md. 14, 34, 109 A.3d 1184, 1195 (Md. 2015). By virtue of Ms. Manlove's "public responsibilities, broad authority and discretion, [she] has a heightened duty of candor to the courts and in fulfilling [her] professional obligations." *The Prosecutor's Heightened Duty of Candor*, ABA Standards for Criminal Justice § 3-1.4. A prosecutor's "honesty is foundational to our judicial system and to our society." *Hinckley*, 2022 WY 18, ¶ 36, 503 P.3d at 602. "Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process." *Id.* (quoting *In re Liotti*, 667 F.3d 419, 429 (4th Cir. 2011)).

[¶37] Ms. Manlove's own statements, including her email to the Cheyenne Police Department, demonstrate she knowingly misled the district court to conceal the reason for her failure to disclose critical evidence. *See generally* W.R.P.C. 4.1 cmt. [1] (Partially true but misleading statements as well as omissions can constitute a misrepresentation); *In re Disciplinary Action Against Sea*, 932 N.W.2d 28, 35 (Minn. 2019), *reinstatement granted sub nom. In re Reinstatement of Sea*, 954 N.W.2d 288 (Minn. 2021) ("[B]latant omission of facts also constitutes false statements and a violation of [Rule 3.3(a).]"). The logical inferences drawn from the record indicate Ms. Manlove had the DNA test results from the Crime Lab in her possession by March 2019, but she did not disclose those results until June 2019. Then, in an attempt to conceal her failure to disclose the evidence, Ms. Manlove asserted at the hearing on the motion to exclude she was not aware the DNA test results were available until after defense counsel filed his motion. There is clear and convincing evidence Ms. Manlove knowingly made a false statement of material fact to the district court, was aware her statement was false, and failed to inform the district court of the false statement previously made. We agree with the Hearing Panel and find Ms. Manlove violated her duty of candor under Rule 3.3(a) by making false and misleading statements to the district court regarding her failure to timely disclose the DNA test results.

[¶38] In a separate case involving similar conduct by Ms. Manlove, Cheyenne Police Department's Case No. 20-47759, the Bar, through Special Bar Counsel, charged Ms. Manlove with five separate Rule violations. The formal charge alleged Ms. Manlove violated her duty of competence under Rule 1.1, her duty of diligence under Rule 1.3, her duty to state meritorious claims and contentions under Rule 3.1(a), her duty of candor in a disciplinary proceeding under Rule 8.1(a), and she had engaged in conduct prejudicial to the administration of justice under Rule 8.4(d). We find Ms. Manlove violated Rules 1.1, 1.3 and 8.1(a). We do not address any contentions related to 3.1(a) because the Hearing Panel did not make any independent findings pertaining to this Rule.[5] Our ruling on Rule 8.4(d) is discussed below in sub-section V(C).

## A. Facts Relevant to Alleged Misconduct by Ms. Manlove in Case No. 20-47759

[¶39] On August 30, 2020, officers with the Cheyenne Police Department responded to a report involving the sexual abuse of a fourteen-year-old girl. The girl reported her mother's boyfriend repeatedly sexually abused her between January 2020 and August 2020, including by assaulting her with a vibrator that he kept in his bedroom. Two months later, a detective with the Cheyenne Police Department submitted a probable cause affidavit to the D.A.'s Office. The affidavit set forth several alleged incidences of sexual abuse, detailed witness statements, and discussed a forensic medical examination of the girl.

[¶40] On October 2, 2020, the D.A.'s Office sent the Cheyenne Police Department a boilerplate request for evidence. Approximately one month later, the Cheyenne Police Department responded to the request and provided an evidentiary log with the dates and evidence the Cheyenne Police Department sent and submitted. The response was uploaded to the Law Enforcement Records Management System (LERMS)[6] by the Cheyenne Police Department on November 5, 2020.

[¶41] The detective completed an initial 32-page report describing her investigation into the girl's sexual abuse allegations on November 2, 2020. The report detailed interviews with several witnesses, including statements of sexual abuse previously charged against the boyfriend, physical items seized from the home, and notes and dates of when the detective uploaded evidence to LERMS. On two pages of the report, the detective noted

---

[5] The Hearing Panel's oral ruling found Ms. Manlove violated Rules 1.1, 1.3, 8.1(a), and 8.4(d), but there were no findings as to Rule 3.1(a). In its written recommendation, the Hearing Panel found Ms. Manlove violated those same Rules, and it dismissed any charges under Rule 3.1 for Special Bar Counsel's failure to prove the alleged violation. The Hearing Panel further found there was not clear and convincing evidence Ms. Manlove violated Rules 8.2(a) and 8.4(b). It is unclear from the record if those were typographical errors in the Hearing Panel's recommendation because the formal charge does not allege Ms. Manlove violated Rules 8.2(a) or 8.4(b).

[6] *See supra* note 4 and accompanying text for description of LERMS.

she requested permission from the girl's mother "to collect [the girl's] DNA." The detective documented on page 31 of the report that on October 29, 2020, the girl's mother brought the girl to the Cheyenne Police Department and the detective "collected buccal swabs from the inside of [the girl's] mouth and logged [it] into CPD evidence." The detective documented in the report she sent the physical items seized and the buccal swabs of the girl, mother, and boyfriend to the Crime Lab for testing.

[¶42] In early January 2021, the Crime Lab uploaded the results of its DNA analysis of the girl's DNA, the boyfriend's DNA, and the physical items seized to BEAST—the independent system the Crime Lab uses to upload evidence for the D.A.'s Office and law enforcement to access and download. Shortly thereafter, on February 8, 2021, the detective uploaded her report of investigation to LERMS. Ms. Manlove testified she had access to the Cheyenne Police Department's reports through LERMS.

[¶43] Ms. Manlove was provided with login information to BEAST almost two years prior and could log into BEAST to search for test results using a name or case number. BEAST further contained a prosecutor module, which allowed Ms. Manlove to go into the system and request a "litigation support package."[7] As Ms. Manlove stated to the district court in 2019, in *State v. R.L.*, the litigation support package is not available to the submitting agency, the Cheyenne Police Department in this instance. It is the D.A.'s Office that specifically requests the litigation support package from the Crime Lab through BEAST.

[¶44] Ms. Manlove did not act on the case or review any records, including the detective's report, until June 2021. She testified at the disciplinary hearing that she found the detective's report "in June when [she] was trying to make a charging decision on the case." While Ms. Manlove did not act on the matter for months, the girl's mother checked-in monthly with the victim-witness coordinator at the D.A.'s Office. The victim-witness coordinator continually responded to the girl's mother by stating Ms. Manlove was working on the matter and was aware of the case. In one response sent to the girl's mother in early December 2020—six months before Ms. Manlove reviewed the detective's initial report—the D.A.'s Office blamed budget cuts as the reason why Ms. Manlove had not reviewed the matter for a charging decision. The response stated:

> Sorry . . . the movement is slow. [Ms. Manlove] just finished up one case to charge. I know this is not what you want to hear but these types of cases are very important to her and she wants to make sure she has all the evidence she needs to go forward with charges. And we are down 5 attorneys in this office because of the Governor's budget cuts. I know that is not a good excuse because of what happened. But I just wanted to let you know that we are working on it.

---

[7] The litigation support package is described and discussed in more detail above in section I(A).

[¶45] Although Ms. Manlove had not yet acted on the matter, the Cheyenne Police Department continued to investigate the allegations. In April 2021, the Cheyenne Police Department submitted an additional affidavit of probable cause with possible additional charges against the boyfriend—approximately two months before Ms. Manlove even considered charging the sexual abuse allegations. Although the information, including the DNA test results, was readily available to Ms. Manlove, she took no action until June 2021. Ms. Manlove emailed the detective on June 7, 2021, more than seven months after the Cheyenne Police Department first submitted its affidavit of probable cause, asking the detective to call her to discuss questions Ms. Manlove had about the case. Additionally, Ms. Manlove asked the detective if she had obtained the girl's DNA, and if her DNA and any other physical evidence had been submitted to the Crime Lab for analysis. At the end of her email, without ever making a phone call to the detective, or retrieving the reports from BEAST, Ms. Manlove stated:

> At this point I am not able to charge this case. I am going to return the Affidavits and wait to hear back from you on the evidence that I do not yet have. If all of the digital forensics and [Crime Lab] forensics are complete, assuming they corroborate the Victim's statements, can you please include that evidence in a new Affidavit?

[¶46] The next day, before receiving a response from the detective, Ms. Manlove signed a declination of case form that was a copy and paste of her email to the detective. At this point, Ms. Manlove still had not logged into BEAST to download the DNA test results, nor had she attempted to call the detective. The detective responded to Ms. Manlove's email after returning to the office from a short leave of absence. The detective informed Ms. Manlove the Crime Lab uploaded its lab reports to BEAST, and those results should be available to the D.A.'s Office. She further informed Ms. Manlove she had already prepared a supplemental report discussing the lab results, which would be uploaded into LERMS. Two days after the detective responded to Ms. Manlove's email, the victim-witness coordinator told the girl's mother the D.A.'s Office did not have DNA evidence to review, and Ms. Manlove "ha[d] not look[ed] at any of the DNA evidence yet."

[¶47] The girl's mother filed a complaint with the BPR regarding Ms. Manlove's delay or lack of diligence in handling the matter. Additionally, a lieutenant from the Cheyenne Police Department responded to Ms. Manlove's declination of case letter and expressed his frustration with her lack of diligence and her victim-witness coordinator's emails to the girl's mother which blamed Ms. Manlove's inaction on waiting for evidence from the Cheyenne Police Department. The lieutenant stated: "We are approaching a full year since this 14-year-old girl reported being sexually assaulted on a continual basis. This predator has not been prosecuted (or even charged). I believe this victim deserves justice and this man is a public danger." He further stated his observation that the amount of time it had

taken for charges to be filed was not a law enforcement shortfall, but instead appeared to be a stalling tactic used by Ms. Manlove. The lieutenant noted the DNA and other physical evidence were sent to the Crime Lab on November 3, 2020, and the results were posted to BEAST on January 12, 2021. He further stated it was concerning Ms. Manlove did not "have the results in the prosecutor's module" on BEAST and questioned why she had not raised any concerns about not having the results for over six months.

[¶48] After receiving the lieutenant's letter, Ms. Manlove asked her investigator to download the DNA test results from BEAST. Those results were accessed by the D.A.'s Office on July 7, 2021. The following day, Ms. Manlove received an email from Special Bar Counsel asking her to respond to the BPR complaint filed by the girl's mother. In her response, Ms. Manlove claimed the complaint was a "coordinated" effort to compel her to prosecute the matter, but she had decided in the exercise of her prosecutorial discretion there was not sufficient evidence to charge the mother's boyfriend, and she was standing by that decision. Ms. Manlove asserted it was not her delay or lack of diligence that led to charges not being filed, but instead it was "a failure on the part of the investigating agency to communicate about evidence and a refusal to conduct necessary additional investigation."

[¶49] Specifically, in her response to Special Bar Counsel regarding the Crime Lab DNA evidence, Ms. Manlove contended:

> The Wyoming State Crime Lab (hereinafter WSCL) accepts submissions from Submitting Agencies, like [Cheyenne Police Department ("CPD")], for work requests for biology, chemistry, evidence, firearms/toolmarks, latent prints and toxicology. WSCL reports its analysis for work requests to the Submitting Agency. In the sexual abuse investigation, CPD submitted its work request to WSCL, and the WSCL reported its analysis to CPD, not to the district attorney's office. **It is the responsibility of the submitting agency, when it receives the WSCL's analysis, to share that analysis with the prosecutor's office or, at the very least, to notify the prosecutor's office that results are available. Since the DA's office is not the submitting agency, we are wholly reliant on law enforcement to inform us that there are Lab results.** In the sexual abuse investigation, CPD obtained the Lab results on January 19, 2021. See: Attachment 2, Webprelog Auditlog from WSCL #20L3889.
>
> Despite notification and receipt of this evidence, CPD did not communicate with my office about it until after I declined to prosecute the case on June 8, 2021. **The lead detective . . .**

18

**never submitted a follow-up report to my office that explained she submitted physical evidence and DNA swabs to the WSCL for analysis.** [The Detective] never submitted a follow-up report to my office regarding the completion of the Lab's analysis. It is the responsibility of the Submitting Agency to provide all reports associated with a case, including forensic analysis to the prosecutor's office. This is particularly important since the standard practice of CPD, dating back to when I first took office in January of 2019, was that CPD's Evidence Department received all of the emails from the WSCL concerning CPD evidence and the availability of reports. At that time, former CPD employee . . . was in charge of the WSCL notifications sent to CPD, and she refused to simply forward to the DA's investigator the WSCL's email notification of the completion of a report. The DA investigator . . . even went so far as to work with the WSCL Quality Control Manager . . . to adjust his agency's reporting mechanism so that emails could be sent to the Submitting Agency and the prosecutor's office. Ultimately, [it was] determined that the only way to accommodate our request would require a tremendous amount of reprogramming, which required paying for the reprogramming, to change the way the WSCL's system functioned.

CPD failed to inform the District Attorney's Office that WSCL results were available; and as of July 2, 2021, CPD has refused my request for additional or follow-up investigation that is necessary for me to make a final determination regarding whether or not this case can be charged.

(Emphasis added).

### B. Violations of the Duty of Competence, Rule 1.1, and Duty of Diligence, Rule 1.3

[¶50] The Hearing Panel found Ms. Manlove violated her duty of competence under Rule 1.1 and her duty of diligence under Rule 1.3 in Case No. 20-47759 by '[f]ailing to collect and examine all relevant evidence . . . before making a charging decision." As previously discussed, Rule 1.1 and Rule 1.3 require a prosecutor to act with reasonable thoroughness, diligence, and promptness in "prosecuting, investigating, and representing the State of Wyoming in all criminal matters." W.R.P.C. 1.1; W.R.P.C. 1.3; *Elliott*, 2011 WY 32, ¶ 8, 247 P.3d at 504. Ms. Manlove argues she did not violate her duties of competence and diligence because it was within her prosecutorial discretion to request additional evidence

19

and decline to pursue charges. While we agree the decision on whether to prosecute a particular case is an executive function within the district attorney's prosecutorial discretion, our decision is not based on Ms. Manlove's charging decision. Instead, our decision is based on whether Ms. Manlove's conduct, or lack thereof, from October 2020 to June 2021 violated Rules 1.1 and 1.3. *See generally Hirsch v. State*, 2006 WY 66, ¶ 11, 135 P.3d 586, 591 (Wyo. 2006) ("The prosecutor is vested with the exclusive power to determine who to charge with a crime and with what crime to charge them."); *Petition of Padget*, 678 P.2d 870, 873–74 (Wyo. 1984).

[¶51]  Testimony of a former prosecutor with the D.A.'s Office shed light on what was happening in the office at the time Ms. Manlove reviewed this matter to make a charging decision. He testified that immediately after he started working for the D.A.'s Office in May 2021, Ms. Manlove asked him to review several "stale" cases. The prosecutor stated he reviewed close to twenty cases "[a]nd many of them were very old." He stated the cases "sat in [Ms. Manlove's] office for a period of years." He testified:

> [FORMER PROSECUTOR]:  [A] lot of cases were very serious, and most of which involved what [Ms. Manlove] called SAM cases, which are sexual assault of minors. So I was tasked with going through all the digital evidence, because [Ms. Manlove] knew I had experience doing this. I used to be the prosecutor in charge in Indiana for doing CAC interviews, which are child advocacy center interviews. So I've got quite a bit of experience in that regard.
>
> So I start looking through these cases. And some of these cases where interviews have been done of certain people at certain times by law enforcement, because they were not acted on in a timely manner, some of those interviews were just lost and gone. And it disturbs me, as a prosecutor, when I see these allegations that have sat there and I didn't see any action on them, except boilerplate sometimes what they would call - - I used to call then an RFE, like a request for evidence. And they would send these boilerplate things over to, say, the sheriff's department or CPD that would say need more evidence, and they would just shift it over. And if they don't respond within a certain time, the CPD or sheriff's department, whatever have you, they'll sometimes just go ahead and send a declination letter.
>
> It was very odd, adversarial environment between our prosecutor's office and their own police force, because you would send over stuff, and they wouldn't get back, necessarily,

20

but it was just some of these cases I was sitting on that transpired years ago, serious allegations of abuse of children. And when I was tasked with reviewing these things, I was told that - - so you may have even seen some of my memos . . . . But I was tasked in advance with if this is not a case that we can prove a hundred percent, we've got good corroboration, all this, we're not filing it, and I would recommend declination. Which, from my school of thought, when I grew up in Indiana - - grew up as a prosecutor in Indiana, that was exactly the last thing I would do. The man [would] not . . . have sat on a desk for four - - or however many years. He would have been in jail soon as the disclosure was made. There wouldn't have been this request for a warrant. There wouldn't have been this review by the prosecutor. They would have just arrested him.

And I think the police officers were fearful of doing that based on another case that I was not involved in . . . .

[¶52] Ms. Manlove, as the Laramie County District Attorney, was a member of the executive branch, and was to "take care that the laws be faithfully executed." Wyo. Const. art. IV, § 4. She further was an officer of the court and was statutorily obligated to "[a]ct as prosecutor for the state in all felony . . . proceedings arising in [Laramie County] and prosecute such cases in the district court[.]" Wyo. Stat. Ann. § 9-1-804(a) (LexisNexis 2021); *Petition of Padget*, 678 P.2d at 871. Wyoming relies on the district attorney to prosecute all criminal offenses within their respective counties. Wyo. Stat. Ann. § 9-1-804(a). If a district attorney "fails or refuses to act [on a criminal matter], the law is voiceless and powerless. It is paralyzed." *Matter of Segal*, 617 A.2d 238, 244. (N.J. 1992).

[¶53] Ms. Manlove, as the district attorney, had a duty to timely inquire into Case No. 20-47759 with care and accuracy, and examine the available evidence, the law, and the facts, and apply each to the other. *Matter of Segal*, 617 A.2d at 244; ABA Standards for Criminal Justice § 3-1.9. In Case No. 20-47759, she failed to act for more than seven months. When her office uploaded a form request for evidence, she received a response from the Cheyenne Police Department the following month. The girl's mother regularly contacted the D.A.'s Office but was repeatedly told Ms. Manlove had not yet reviewed the case. Ms. Manlove admitted she did not know the police report was available until she began looking at the case in June 2021—seven months after her office received the first affidavit of probable cause. She also did not access or review the DNA test results from BEAST until July 2021, which was after the Cheyenne Police Department responded to her declination of the case. Further, Ms. Manlove admitted she made no attempt to communicate about the case with the detective prior to declining to pursue charges.

21

[¶54] The Cheyenne Police Department kept in contact with the girl's mother and continued to investigate and submit information to the D.A.'s Office, including possible additional charges relating to the abuse of the girl's brother. It conducted a thorough investigation, as evidenced by the 32-page report. The detective offered to revise the affidavit of probable cause to include the Crime Lab results but asked if Ms. Manlove wanted to review the results first. The delay in making a charging decision was not the result of a "failure on the part of law enforcement" as Ms. Manlove asserted in her response to the Bar complaint. Instead, it was Ms. Manlove's failure to act for several months that resulted in the severe delay.

[¶55] "[N]o professional shortcoming is more widely resented than procrastination" because the public's interests "often can be adversely affected" by a prosecutor's failure to act promptly in pending matters. W.R.P.C. 1.3, Comment 3; *The Client of the Prosecutor*, ABA Standards for Criminal Justice § 3-1.3 (4th ed. 2015). Ms. Manlove cannot escape accountability under the Rules of Professional Conduct by claiming a charging decision is within her discretion, when an attorney acting in a civil capacity would face disciplinary action for similar conduct. *See, e.g.*, *Bd. of Pro. Resp. v. Hiatt*, 2018 WY 63, ¶ 21, 422 P.3d 940, 947 (Wyo. 2018) (finding an attorney violated Rule 1.3 when he performed no work on a client's child custody case for nearly three months and neglected his responsibility to obtain a guardian ad litem); *Bd. of Pro. Resp. v. Pretty*, 2013 WY 10, ¶ 9, 295 P.3d 833, 834–35 (Wyo. 2013) (finding an attorney violated Rules 1.1 and 1.3 when he failed to perform any work on a matter for two months). Ms. Manlove gave no assessment or review of Wyoming's interest in prosecuting Case No. 20-47759 for more than seven months, and as her own employee testified, this type of conduct is not what normally occurs in other prosecutor's offices. We find clear and convincing evidence established Ms. Manlove violated her duties of competence and diligence under Rules 1.1 and 1.3 when she failed to take any action on this matter for over seven months. *See generally Matter of Disciplinary Proc. Against Lindberg*, 494 N.W.2d 421, 424 (Wis. 1993) (finding a violation of the duty of diligence when a prosecuting attorney failed to make any attempt to contact a victim and an eyewitness in a sexual assault case until the day before the preliminary hearing, which resulted in a dismissal of the criminal charges after the victim and witness did not appear).

### C. Materially False Statements in a Disciplinary Proceeding, Rule 8.1(a)

[¶56] The Hearing Panel found Ms. Manlove made a materially false statement concerning Case No. 20-47759 in the disciplinary proceeding. Rule 8.1(a) provides: "[A] lawyer . . . in connection with a disciplinary matter, shall not: (a) knowingly make a false statement of material fact[.]" The Rule requires a "knowing" state of mind, which "denotes actual knowledge of the fact in question." W.R.P.C. 1.0(g). Ms. Manlove's knowledge of her intentionally false statements can be inferred from the matter discussed above in section I, *State v. R.L.*, and other circumstances. *Id.*; *see also Hinckley*, 2022 WY 18, ¶¶ 37–38,

503 P.3d at 602 (discussing knowledge requires awareness, deliberateness or intention as distinguished from inadvertently).

[¶57] In Case No. 20-47759, Ms. Manlove's response to Special Bar Counsel regarding the reason she failed to review the DNA evidence was similar to the excuse she gave to the district court for failing to timely disclose evidence in *State v. R.L.* Ms. Manlove claimed she had not reviewed the evidence because she was "wholly reliant on law enforcement to inform [her] that there [were] Lab results." She further claimed the detective "never submitted a follow-up report to [the D.A.'s Office] that explained she submitted physical evidence and DNA swabs to the [Crime Lab] for analysis." Ms. Manlove further stated "[d]espite notification and receipt of this evidence, [the Cheyenne Police Department] did not communicate with my office about it until after I declined to prosecute the case on June 8, 2021." She claimed there had not been a delay or a lack of diligence on her part, but instead it was "a failure on the part of the investigating agency to communicate about evidence[.]" We find there is clear and convincing evidence that Ms. Manlove's statements were factually false, and she knew her statements were false.

[¶58] Ms. Manlove testified she did not review the initial report until June 2021, more than four months after the Cheyenne Police Department uploaded it to LERMS. The initial report informed Ms. Manlove the Cheyenne Police Department collected physical evidence and the victim's DNA and submitted this evidence to the Crime Lab for further testing. Ms. Manlove falsely informed Special Bar Counsel that the Cheyenne Police Department did not notify her this evidence had been obtained and analyzed until after she declined to prosecute the case. Ms. Manlove also knowingly misled Special Bar Counsel about the Cheyenne Police Department's responsibility to notify her the DNA results were available. Ms. Manlove knew from what occurred two years prior in *State v. R.L.* it was not standard protocol to rely on the Cheyenne Police Department to notify prosecutors test results from the Crime Lab were available. Indeed, a former assistant district attorney who began her employment at the beginning of Ms. Manlove's term, discussed the procedure for accessing test results from BEAST and the responsibility of the D.A.'s Office:

> [HEARING PANEL]: Tell me, if you would, about the BEAST system. As I understand it, that's an acronym for an evidence tracking and - - when something goes to the crime lab, it's put into the BEAST system.
>
> [FORMER ASSISTANT DISTRICT ATTORNEY]: Sure.
>
> [HEARING PANEL]: You're familiar with that system?
>
> [FORMER ASSISTANT DISTRICT ATTORNEY]: I am.
>
> [HEARING PANEL]: Broadly speaking, how does it work?

23

[FORMER ASSISTANT DISTRICT ATTORNEY]: So the BEAST system is the independent system that the Division of Criminal Investigation uses to upload their evidence. Cheyenne Police Department, the sheriff's office have one system that they use; highway patrol has a separate; BEAST is what [Wyoming Department of Criminal Investigation ("DCI")] uses.

There was a bit of a struggle in the beginning about how do we access results, because the input on BEAST comes from whoever the submitting agency is. So Cheyenne Police Department is, say, submitting an item with blood to be tested, it's their agency that originates the submission.

For whatever reason, and this was a discussion with the programmer at DCI -- I had a good relationship with them. They had been my client, so I did a lot of the interface in the beginning -- the program was coded such that, when results come back, they only went to whoever that submitting agency was.

They had talked about re-coding the program to add in an additional email that perhaps Cheyenne Police Department and the sheriff's office would agree they would put in one person's email from the district attorney's office, but largely the discussion was that wasn't needed, because there was a prosecutor module for BEAST, and we were all outfitted with individual usernames and passwords.

And the program was on our computer such that I could log in with my individual username, and I had to independently search whatever the case was by the name or the case number. But I could get in under my own username and see what was available.

When you're in the office at first and taking over the cases, it's difficult to know, maybe, what was at the crime lab; but certainly, when they were your own cases and you were involved in discussions with law enforcement, I would check daily when I was waiting for something that I knew a particular result was going to come back.

24

And I believe we had a training -- I don't remember who, but we had a training on how we could get in, how to use our usernames, how to see what was there and then how to -- our legal assistants mostly did this -- request what was called a litigation support package.

So when you initially get a lab report, it just says this is the result, you know, presumptive positive, marijuana. You get none of the notes. And so through the BEAST we'd have to go in and request a litigation support package, and then DCI would upload the reports, all the attendant notes that came with the one-page report.

[HEARING PANEL]: Was it your job as the prosecutor to request that litigation support package?

[FORMER DISTRICT ATTORNEY]: Ultimately because it's my Brady obligations, but we worked in conjunction with our legal assistants to get whatever evidence we needed, but it fell on us and not the crime lab.

[HEARING PANEL]: Just so everyone's clear, what do you mean by "Brady"?

[FORMER DISTRICT ATTORNEY]: Sorry. The prosecutor's obligation to provide any exculpatory evidence, any evidence in the case, to the opposing party.

[¶59] Ms. Manlove's legal assistant further expanded on the process for obtaining test results through BEAST:

[HEARING PANEL]: Since you're a legal assistant, I just have a couple questions. Can you tell me -- I'm -- I'm just wrapping my head around this BEAST system and that you legal assistants get information out of the BEAST system to provide to attorneys when prosecuting a case -- is that correct?

[MS. MANLOVE'S LEGAL ASSISTANT]: Yes.

[HEARING PANEL]: And are you able in the BEAST system just to go in and search by case -- is it case number, by last name? How do you get discovery?

25

[MS. MANLOVE'S LEGAL ASSISTANT]: I think you can do it any -- in all of those ways.  I typically go in and use the . . . number that they gave to -- that the lab gets.

[HEARING PANEL]: The case number?

[MS. MANLOVE'S LEGAL ASSISTANT]: Yeah, case number . . . .

[HEARING PANEL]: And when an attorney is prosecuting a case, and they need you for your support to help them get discovery . . . is it normally just like , Hey . . . I really need this discovery, and you do everything you can to round that discovery in order to support them in prosecuting a case?

[MS. MANLOVE'S LEGAL ASSISTANT]:  Well, we have a system.  What we do is, when we first get a case, we have to fill out these papers and submit them to the law enforcement agency that has that case.  And then we get -- like if it's -- let's say it's the Cheyenne Police Department.  We get our digital evidence from one person, and she emails us a list of all the stuff that she just downloaded.  So we know we now have discovery in that case.

And then if it's normally paper products, like the reports and things like that, if [Ms. Manlove] asks me . . . then I get it, but I always go into it again right before I get the discovery to the defense attorney so I know that they have everything I have of this date.  And then we also have a discovery deadline date, so I will check it again, but I always check it again on my last discovery deadline day.

[HEARING PANEL]: And if you don't have it or it's not uploaded, do you usually reach out by email or phone[?]

[MS. MANLOVE'S LEGAL ASSISTANT]:  We usually reach out by email.

*      *      *

[HEARING PANEL]: . . . If Ms. Manlove said to you about a certain case, case X, . . . I'm analyzing this file.  I see there may have been materials sent to the lab, and gives you the police

department number and the name of the victim and the accused, with your username and password, you could obtain all the information on BEAST; isn't that true?

[MS. MANLOVE'S LEGAL ASSISTANT]: Yeah, . . . any legal assistant in the office could. Or -- and the investigator.

[HEARING PANEL]: Everybody knew that?

[MS. MANLOVE'S LEGAL ASSISTANT]: Yeah, but we would have to know it's there. And we would have to know to look for it. I only -- I should have clarified, I only look for the cases I'm -- that are active that I'm working on . . . . But if she has a case that she's just waiting to decide if she's going to charge, I don't look -- I never looked for those unless they told me it's there.

[HEARING PANEL]: If she asked to look at a case she's studying --

[MS. MANLOVE'S LEGAL ASSISTANT]: I will give her whatever I know is there . . . .

[HEARING PANEL]: How do you know what's there until you open the BEAST and look?

[MS. MANLOVE'S LEGAL ASSISTANT]: Well, that's what I'm saying, if she says, Please give me this, because . . . I want everything I have to know if it's charged, I will do that . . . . But I won't look at it again unless she charges it, unless they tell me they've added something . . . . Otherwise, . . . I don't have time to look at cases --

[HEARING PANEL]: Anytime she says get it --

[MS. MANLOVE'S LEGAL ASSISTANT]: I get it.

[HEARING PANEL]: -- you type in your username and password, and there it is?

[MS. MANLOVE'S LEGAL ASSISTANT]: I don't -- that's my last place to look. I look in LERMS first because typically, if it's done, it's in LERMS.

27

[HEARING PANEL] I'm only asking about BEAST, and I want to know . . . definitively, if she asked you, you can do it on the spot?

[MS. MANLOVE'S LEGAL ASSISTANT]: Yeah, I can.

[HEARING PANEL]: No emails, no waiting for responses, you key in your username and password, and there it is?

[MS. MANLOVE'S LEGAL ASSISTANT]: Yeah.

[¶60]  Approximately two years prior to Ms. Manlove reviewing the evidence in Case No. 20-47759, the evidence manager at the Cheyenne Police Department informed the D.A.'s Office by e-mail the police department would not send over DNA test results.  She provided information to the D.A.'s Office on how to access any results through BEAST.  The email read:

> Please be advised that we will not be sending over results on cases in the future.  As I have conveyed to multiple people in the DA's Office, there is a Prosecutor Module for BEAST in which anyone can log in at any time and see what has been submitted on a case and what reports are available.  I have also attached the email that was sent back in March to the DA's Office from [the Department of Criminal Investigation] which outlines how to go about setting up your individual accounts.  In addition, [the Department of Criminal Investigation] would be your point of contact should you have any issues accessing or viewing cases in the system.  I am not sure how different the Prosecutor Module is from the Agency Module, but [we] are more than happy to demonstrate how to look up cases and retrieve information to whomever in the DA's Office.

[¶61] Ms. Manlove was given her username and password to access results from the BEAST system on or about June 18, 2019.  The next day she was provided with a user guide for BEAST.  She further received training on how to use BEAST, and how to download and request information, including the litigation support package.  We find Ms. Manlove knew how to access the DNA test results through BEAST by searching the software with the Cheyenne Police Department's assigned case number.

[¶62] Ms. Manlove did not access any records for Case No. 20-47759, including the detective's initial report, which indicated when the physical evidence and DNA buccal swabs were sent to the Crime Lab, until more than seven months after receiving the

affidavit of probable cause. Further, neither she nor anyone in her office, accessed the DNA test results on BEAST until after she received the written response to her declination letter and the girl's mother filed a complaint with the Bar. Yet, Ms. Manlove learned two years prior that the Cheyenne Police Department did not forward notification DNA test results were available on BEAST, so she was to search for and access any test results herself through BEAST. We find Ms. Manlove's statements she was wholly reliant on law enforcement to notify her DNA test results were available and they failed to do so were materially false. We agree with the Hearing Panel there was clear and convincing evidence Ms. Manlove violated Rule 8.1(a) in an effort to avoid taking responsibility for her failure to timely review serious criminal allegations.

### III. Matter No. BPR 2021-005

[¶63] In the first formal charge, Special Bar Counsel alleged facts involving two complaints filed against Ms. Manlove in docket number BPR 2021-005 for her charging decision and plea agreement in an underlying criminal matter. Special Bar Counsel alleged Ms. Manlove entered into a plea agreement without reviewing evidence from a separate criminal allegation involving the same victim and defendant. The formal charge does not clearly identify what Rule(s) Ms. Manlove allegedly violated, though during the disciplinary hearing Special Bar Counsel referred to it as a case involving a lack of competence and diligence. The Hearing Panel made no findings with respect to BPR 2021-005, though it did assess costs for this matter. Due to the lack of specificity in the formal charges and the lack of findings in the report and recommendation, we decline to conduct our own analysis of whether Ms. Manlove's conduct in this criminal matter violated the Rules, and we will not impose any administrative fees for BPR 2021-005. *See Hinckley*, 2022 WY 18, ¶¶ 8–9, 503 P.3d at 594–95 ("Our rule and due process prohibit us from finding a violation of the rules on the [basis] of something not charged with particularity.").

### IV. BPR 2021-039

[¶64] In the first formal charge, Special Bar Counsel alleged Ms. Manlove acted recklessly by failing to competently discharge the duties of her office with respect to the underlying matter in the Bar's docket number, BPR 2021-039. Although the Hearing Panel's recommendation addresses facts related to BPR 2021-039, the recommendation does not state with specificity whether the Hearing Panel found Ms. Manlove's conduct in the underlying matter violated any Rule(s). The Hearing Panel did however recommend costs for this matter. We have reviewed the documents in the record related to the factual allegations in BPR 2021-039 and find Ms. Manlove did not violate the Rules of Professional Conduct. We therefore do not impose any costs for the complaint filed in BPR 2021-039.

### V. Alleged Violations of Wyoming Rule of Professional Conduct 8.4(d)

29

[¶65]  In addition to the Rule violations discussed above in *State v. R.L.* (sub-section I above) and Cheyenne Police Department's Case No. 20-47759 (sub-section II above), the Hearing Panel found Ms. Manlove's conduct in both these matters violated Rule 8.4(d).  It also found Ms. Manlove violated Rule 8.4(d) in Criminal Action No. CR 2019-1739, Circuit Court, First Judicial District, Laramie County, Wyoming, by failing to timely file criminal charges and issuing a materially misleading press release.  It further found Ms. Manlove violated Rule 8.4(d) through her case management, personnel management, and the mass dismissal of several pending criminal cases.  After reviewing the record, we find Ms. Manlove's conduct in *State v. R.L.*, Case No. CR 20-47759, Criminal Action No. CR 2019-1739, her case management, and her mass dismissal of several pending criminal cases violated Rule 8.4(d).  We do not make any findings regarding whether Ms. Manlove's personnel management violated Rule 8.4(d).

## A.  Applicable Test and Review for Rule 8.4(d) Violations

[¶66]  Rule 8.4(d) provides: "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice[.]"  Recently, in *Hinckley*, we adopted the *Owusu* test to determine whether an attorney's conduct violates Rule 8.4(d).  2022 WY 18, ¶¶ 71–72, 503 P.3d at 611–12 (citing *In re Owusu*, 886 A.2d 536 (D.C. 2005)).  "Under that test, [Special Bar Counsel] must present clear and convincing evidence: '(1) that the attorney acted improperly in that he either took improper action or failed to take action when he or she should have acted; (2) that the conduct involved bears directly upon the judicial process (i.e., the administration of justice) with respect to an identifiable case or tribunal; and (3) that the conduct tainted the judicial process in more than a *de minimis* way, meaning that it at least potentially impacted upon the process to a serious and adverse degree.'"  *Id.* at ¶ 72, 503 P.3d at 611 (quoting *In re Owusu*, 886 A.2d at 541).  When applying this test, we focus "on conduct which interferes with the legal process." *Id.* at ¶ 71, 503 P.3d at 611.  Rule 8.4(d) "encompass[es] derelictions of attorney conduct considered reprehensible to the practice of law," but is "not so broad as to encompass any and all misconduct by an attorney." *In re Owusu*, 886 A.2d at 541.

## B.  Docket No. 34-280, *State v. R.L.*

[¶67]  First, in applying the *Owusu* test to Ms. Manlove's conduct in *State v. R.L.*, we find Special Bar Counsel presented clear and convincing evidence Ms. Manlove engaged in conduct prejudicial to the administration of justice.  As we discussed in sub-section I above, Ms. Manlove failed to timely obtain and disclose evidence in compliance with a case management order and the Rules of Criminal Procedure, which ultimately resulted in the permanent dismissal of serious criminal charges against an alleged habitual offender.  Ms. Manlove further misled the district court regarding her reason for failing to disclose DNA test results, which she admittedly had in her possession for several months.  Ms. Manlove's failure to timely disclose evidence bore directly on the judicial process and impacted the process in a serious and adverse way. *See Hinckley*, 2022 WY 18, ¶ 73, 503 P.3d at 612

(finding a prosecutor's failure to promptly request pertinent records in compliance with a court order violated Rule 8.4(d)); *Matter of Kurtzrock*, 138 N.Y.S.3d 649, 665 (N.Y. App. Div. 2d 2020) ("A prosecutor's failure to disclose exculpatory information has been determined to constitute conduct that is prejudicial to the administration of justice in violation of rule 8.4(d)."). We agree with the Hearing Panel and find there is clear and convincing evidence Ms. Manlove's conduct in *State v. R.L.* violated Rule 8.4(d).

## C. Cheyenne Police Department Case No. 20-47759

[¶68] Similarly, in Case No. 20-47759, we find Special Bar Counsel presented clear and convincing evidence Ms. Manlove violated Rule 8.4(d) by engaging in conduct prejudicial to the administration of justice. As we discussed in sub-section II above, Ms. Manlove improperly failed to act for more than seven months on a case involving the alleged sexual abuse of a minor. We found her lack of transparency and her attempt to conceal her misconduct by making false and misleading statements about the Cheyenne Police Department's investigation was improper. The first part of the *Owusu* test is met.

[¶69] The second part of the *Owusu* test requires Ms. Manlove's conduct to be related "to an identifiable case or tribunal[.]" *Hinckley*, 2022 WY 18, ¶ 72, 503 P.3d at 611. "The rule is most often applied to conduct connected with proceedings before a tribunal," but can bear on matters tangentially related to a pending or anticipated proceeding. *See generally* E. Bennett, H. Gunnarsson, Center for Professional Responsibility, *Annotated Model Rules Professional Conduct* § 8.4 (2019 ed.); *Law. Disciplinary Bd. v. Kupec*, 505 S.E.2d 619, 634 (W. Va. 1998) ("Courts that have defined the scope of 'conduct that is prejudicial to the administration of justice' have concluded that conduct which interferes with civil or criminal litigation processes comes within the meaning of 'conduct that is prejudicial to the administration of justice.'"). In this case, element two of the *Owusu* test is met because Ms. Manlove's failure to act hampered the efficient and proper operation of the courts by delaying prosecution of a serious criminal matter in Laramie County. *See generally Iowa Supreme Ct. Att'y Disciplinary Bd. v. O'Brien*, 971 N.W.2d 584, 591 (Iowa 2022), *as amended* (Mar. 21, 2022) ("While there is no 'typical' conduct that prejudices the administration of justice, it includes conduct that hampers 'the efficient and proper operation of the courts,' such as unnecessary court proceedings, delays, or dismissals.").

[¶70] "[P]ublic confidence in the legal profession is a critical facet to the proper administration of justice and conduct that negatively impacts . . . the public's image or the perception of the courts[, the criminal justice system,] or the legal profession violates Rule 8.4(d)." *Att'y Grievance Comm'n of Md. v. Kapoor*, 894 A.2d 502, 518 (Md. 2006); *In re Griffing*, 236 So. 3d 1213, 1221 (La. 2017) (finding a violation of Rule 8.4(d) by an assistant United States attorney for failing to disclose an intimate relationship with an FBI agent during her prosecution of criminal defendants). Here, the girl's mother contended Ms. Manlove's conduct negatively impacted her confidence in the justice system. She

stated, "My family has been victimized by my ex-boyfriend and now we are being victimized by our justice system."

[¶71]   Ms. Manlove's conduct negatively impacted the public's perception of the criminal justice system when she placed blame on the Cheyenne Police Department for the delay in the prosecution of Case No. 20-47759.   In two separate news media interviews, Ms. Manlove disparaged the Cheyenne Police Department's investigation in Case No. 20-47759, but never mentioned she neglected the matter for months.

> [MS. MANLOVE]: [T]he . . . case that you're likely referring to was a sexual assault of a minor investigation that the Cheyenne Police Department submitted to my office for a charging decision. . . . Before I'm going to charge someone with a violent felony, I'm going to make sure I can prove beyond a reasonable doubt that that person is guilty.  And at that point in time, I believed that that investigation was not complete.
>
> And instead of doing the additional work that I requested, the police department's response was to file a lawsuit against me. And likely that was done in an effort to try and give credence to this notion that I'm not competent, that I'm not ethical . . . .
>
> [RADIO HOST]: Was some of that work have to do with DNA analysis?
>
> [MS. MANLOVE]: The DNA analysis had been conducted. The police department failed to ever inform my office that the DNA analysis had even been requested, much less that it was done.[8]
>
> I did look at it.  And anybody who has any common sense at all can tell you that DNA is not the end-all be-all of a criminal prosecution.  And it wasn't in this case either.  It was a piece of information.  It was important information.  And that -- that kind of misnomer that, oh, there was DNA evidence is, I think, really a simplification of the failure on the part of law enforcement to do what the prosecutor asked.

---

[8] Refer to our discussion in sub-section II(A) for facts surrounding when Ms. Manlove and the D.A.'s Office were notified about the Cheyenne Police Department sending the physical evidence and DNA swabs to the Crime Lab for testing.

In a separate interview, she stated:

> [RADIO HOST]: [T]his is from Cowboy State Daily. Latest charges filed by the Board of Professional Responsibility October 18th alleges that your actions led to [the] release of two men, including one accused of sexually abusing a 14-year-old girl.
>
> [MS. MANLOVE]: Well, you know, . . . you won't be shocked when I tell you that the media got something wrong . . . . There wasn't a man who was released from jail for sexually assaulting a 14-year-old. . . . What happened was the Cheyenne Police Department submitted an investigation to my office for a charging decision. I prosecute the crimes-against-children cases, so it was my decision. And that investigation just was not very good. . . . It wasn't thorough. It wasn't complete. There were a lot of holes. So what I did was asked [sic] the police department -- because that's all I can do. I'm not the chief of -- I'm not the mayor. I don't run that shop. Was ask, hey, here's -- here's additional work you need to do in your investigation in order for me to make a charging decision. And instead of doing that, the lieutenant who was in charge of the detective division at the time worked with the City of Cheyenne and the office of bar counsel to file a lawsuit against me[9] . . . . In the end, . . . if that young girl was sexually assaulted, there's still not a complete investigation.

[¶72]   The Rules set forth a lawyer's responsibilities in the preamble: "[A] lawyer should further the public's understanding of and confidence in the rule of law and the justice system[.]" W.R.P.C. pmbl. cmt. 6.  As a public officer charged with the administration of justice, Ms. Manlove's behavior had the capacity to bolster or damage the public's perception of the criminal justice system.  Ms. Manlove chose to follow a path that damaged the public's view in what can only be interpreted as an effort to circumvent public knowledge of her failure to timely review a sexual abuse of a minor case.  Ms. Manlove falsely and publicly blamed the police department for failing to notify her the DNA analysis had been requested, even though the police department's request for the DNA analysis was

---

[9] Ms. Manlove's statement the City of Cheyenne filed suit against her is inaccurate.  Due to a potential conflict with this disciplinary proceeding and her refusal to prosecute Case No. 20-47759, the City of Cheyenne filed a petition pursuant to Wyoming Statute § 9-1-603(c) requesting the district court to appoint the Wyoming Attorney General to review, investigate, and take appropriate action on Case No. 20-47759.  The district court granted the petition and ordered the Attorney General to review and take any appropriate action on Case No. 20-47759.

in the detective's initial report that Ms. Manlove admittedly reviewed before her public statements. Ms. Manlove did not open that report for four months after it was uploaded to LERMS, and she never attempted to obtain the DNA test results through BEAST until after a complaint was filed with the Bar. Ms. Manlove's conduct negatively impacted the public's perception of the criminal justice system, especially the Cheyenne Police Department. We agree there is clear and convincing evidence that Ms. Manlove violated Rule 8.4(d) with respect to her false public statements, false statements to Special Bar Counsel, and in her delay in reviewing Case No. 20-47759. *See generally Matter of Garringer*, 626 N.E.2d 809, 813 (Ind. 1994), *cert. denied Matter of Garringer*, 513 U.S. 826, 115 S. Ct. 93, 130 L. Ed. 2d 44 (1994) ("Unwarranted public suggestion by an attorney that a judicial officer is motivated by criminal purposes and considerations does nothing but weaken and erode the public's confidence in an impartial adjudicatory process" and is prejudicial to the administration of justice.); *In the Matter of McClellan*, 754 N.E.2d 500, 502 (Ind. 2001) (attorney violated Indiana Rule 8.4(d) by filing a petition which "demean[ed] the judiciary and the legal profession").

### D. Criminal Action No. CR 2019-1739, Circuit Court, First Judicial District, Laramie County, Wyoming

[¶73] The Hearing Panel found Ms. Manlove's issuance of a materially misleading press release in Criminal Action No. CR 2019-1739 violated Rule 8.4(d). The Hearing Panel found Ms. Manlove's conduct negatively impacted the public's perception or efficacy of the courts or legal profession. We agree.

#### 1. *Facts Relevant to Alleged Misconduct in CR 2019-1739*

[¶74] On Sunday, September 8, 2019, a deputy with the Laramie County Sheriff's Office investigated the theft of a firearm. The stolen firearm and a small amount of methamphetamine were found in the possession of the suspect. A background check on the National Crime Information Center revealed the suspect had "convictions for robbery with a weapon, burglary and kidnapping amongst other felony charges[.]" The background check did not reveal whether the suspect "was disqualified from being in possession of a firearm." The deputy executed an affidavit of probable cause that same day.

[¶75] The following day, Monday, September 9, 2019, an assistant district attorney reviewed the affidavit of probable cause and drafted an information charging the suspect with the theft of a firearm and misdemeanor possession of methamphetamine. Staff with the D.A.'s Office filed the information in circuit court, but the information was returned by the circuit court clerk's office because the D.A.'s Office did not attach an arrest warrant. When the document was returned, the legal assistant corrected the error and placed the corrected information in a court run mailbox to be taken to the circuit court for filing. The D.A.'s Office did not file the corrected information with the circuit court until Thursday, September 12, 2019.

34

[¶76] The suspect was released from jail because charging documents were not filed before the expiration of his 72-hour hold. An arrest warrant was issued by the circuit court the same day the corrected information was filed. Before the suspect could be arrested, he shot four people, killing two, and injuring two minor children. An article in the *Wyoming Tribune Eagle* stated: "After being arrested Sept. 8 on the two misdemeanor charges, [the suspect] was released [on] Sept. 11 because Laramie County District Attorney Leigh Anne Manlove's office declined to press charges."[10]

[¶77] In response to the news article, Ms. Manlove issued a press release stating the following:

> [The suspect] was arrested on Sunday, September 8th and booked into the jail at 11:00 AM. . . . The next day, Monday, September 9th, the affidavit of probable cause—which is the document that permits [the district attorney's office] to charge an individual—was received by the office. Later that same day, [the suspect] was charged with one count of misdemeanor theft for unauthorized control or transfer of an interest in a Century Arms 9mm handgun, and one count of misdemeanor possession of methamphetamine . . . .
>
> **The Circuit Court, which was closed that week, file-stamped the Information—which is the charging document—on Thursday, September 11th.[11]** You are charged with a crime when the DA files an Information, so [the suspect] was charged. Unfortunately, by then, [the suspect] had not made his Initial Appearance within 72 hours of his arrest, and he was released from the jail on Wednesday, September 11th at 12:03PM. . . . The Circuit Court set his Initial Appearance for Monday, September 16th.

(Emphasis added). She further stated: "it seems the media did not look at the court's schedule or the file-stamped documents or even something as simple as the date on the

---

[10] In her response to the formal charge, Ms. Manlove "affirmatively allege[d] that she later learned from the Laramie County Attorney . . . the computer system at the jail does not distinguish between when an inmate is released because his 72-hour hold expired, and when an inmate is released because the prosecutor . . . declined to pursue the case." She stated the system lists every inmate who is released because the 72-hour hold expired as "declined by DA."

[11] There is an error in the date in Ms. Manlove's press release. The Information was file stamped on Thursday, September 12, 2019, not Wednesday, September 11, 2019. The arrest warrant was signed by the circuit court on Thursday, September 12, 2019.

information, and as a result misleading and inaccurate information has been disseminated to our community, which is a disservice."

[¶78]  Although Ms. Manlove did not admit her office's failures in her press release, she did admit to those failures in a news media interview immediately before her disciplinary hearing.  She stated the following:

> [RADIO HOST]:  . . . .  Speaking about prosecuting people, you know, the community, the bar counsel alleges that, you know, you chose, your office chose not to prosecute a few men . . . .  And they were accused of dangerous crimes.  You didn't prosecute them; therefore, they were released.  I know one of the men went ahead and committed other crimes after that.  What was the reasoning behind that, you know, that you chose not to prosecute?
>
> [MS. MANLOVE]: . . . . One case, [Criminal Action No. CR 2019-1739], [the suspect] was arrested for stealing a handgun, which at the time was a misdemeanor offense, and possession of marijuana.[12]  At the time that he was arrested, my office made a mistake.  We didn't get our paperwork submitted to the court in time.  So he was released, as is required under law, after 72 hours.  He was arrested.  He wasn't charged by my office, so he had to be released.  We did get him charged.  There was a warrant out for him.  And before he would be arrested on that warrant, he committed horrible, horrible crimes.  He -- he killed two people in our community and shot several others.  Those were his decisions.  He's responsible for that.  And he's now serving a life prison [sic] for those crimes.

### 2. *Discussion of Rule 8.4(d) Violation and CR-2019-1739*

[¶79]  Before Ms. Manlove issued her press release, she was informed by her staff the information was returned and not timely filed with the circuit court.  Although Ms. Manlove did admit publicly and in the disciplinary hearing that the charging documents were not filed earlier due to a mistake by her office, she stood by her statement in the press release that the circuit court was closed.  She contends her statement was based on an email from a legal assistant in her office.  Our review of the email message Ms. Manlove relies

---

[12] The suspect was charged with possession of methamphetamine not marijuana.

36

on indicates otherwise. The email verifies the circuit court was accepting filings, including the filing of new criminal informations.[13]

[¶80] During the disciplinary hearing, a circuit court judge testified the circuit court was open and continued to receive filings. He confirmed the circuit court "saw people who were in jail every day; . . . took informations every day; [and] did the duties that were constitutionally required[.]" He further testified 26 informations were filed during the week Ms. Manlove alleged the circuit court was closed.

[¶81] Ms. Manlove's failure to immediately accept responsibility for her office's mistake and her false statements placing blame on the circuit court reflected negatively on the judicial branch and conceivably engendered disrespect and a lack of public confidence in the Laramie County Circuit Court. *See Att'y Grievance Comm'n of Md. v. White*, 480 Md. 319, 382, 280 A.3d 722, 758 (Md. 2022). We agree there is clear and convincing evidence Ms. Manlove's conduct in Criminal Action No. CR 2019-1739 violated Rule 8.4(d). *See generally id*. at 758–59 (failing to file necessary pleadings and making misrepresentations to various courts to cover up misconduct is conduct prejudicial to the administration of justice); *Att'y Grievance Comm'n of Md. v. Cassilly*, 262 A.3d 272, 326 (Md. 2021) (finding a prosecutor who knowingly makes false statements of fact to the court and acts with intentional dishonesty engages in conduct that is prejudicial to the administration of justice because it negatively impacts the public perception of the legal profession).

### E. Mass Dismissal of Cases, Case Management, and Prosecutorial Discretion

[¶82] The Hearing Panel found Ms. Manlove's personnel management and case management violated Rule 8.4(d). It found the following conduct as alleged in the first formal charge violated Rule 8.4(d):

- Purging the District Attorney's Office of competent attorneys and staff on her first day in office without having an adequate transition plan in place to ensure the smooth and competent administration of justice;

- By directing staff not to report overtime and by fostering a workplace environment of fear and intimidation where

---

[13] An additional email labeled Exhibit 7 and attached to Ms. Manlove's Response and Answer to Special Bar Counsel's Formal Charge also indicates the circuit court was accepting filings. This email is from the D.A.'s Office support specialist and is dated before the press release, September 10, 2019. The email was sent to all employees at the D.A.'s Office, including Ms. Manlove. This email states: "So for this week that circuit won't be taking filings I spoke with [the clerk] and **I will only be taking informations and pretrial memos up during my court run to get filed.** She asked kindly that if anyone in the office needed something filed immediately please call her before hand [sic] and let her know you're coming . . . . Anything that can wait she asked that we keep it until after the 13th to file."

> nonexempt employees were afraid to report overtime or to request overtime for fear of retaliation from [Ms. Manlove];
>
> - Failing to take prompt action to fill vacancies in her office;
>
> - Exaggerating the impact of budget restraints and prematurely making drastic unjustified reductions in the level of services provided by her office;
>
> - Directing the wholesale dismissal of filed cases without considering the merits of individual cases and guidelines for dismissals of criminal cases;
>
> - Directing dismissals of cases because she was not prepared to go to trial; and
>
> - Filing improper motions to dismiss after she had been warned by judges to discontinue such filings.

The Hearing Panel also found Ms. Manlove's conduct as listed above violated her duty of competence under Rule 1.1. It further found she violated her duty of diligence under Rule 1.3 "by directing dismissal of cases because she was not prepared . . . to go to trial, by filing improper motions to dismiss after she had been warned by judges to discontinue such filings, and by failing to take prompt actions to fill vacancies in her office." Lastly, it found she violated her duty to follow the rules of the tribunal under Rule 3.4(c) "by failing to comply with judges' directions to stop filing the budgetary constraints letter in support of motions to dismiss." Our review of the record supports finding Ms. Manlove's mass dismissal of approximately 400 cases based on her mismanagement of the caseload and her drastic and premature reductions in the level of services provided by the D.A.'s Office violated Rules 8.4(d), 1.1 and 1.3. Our review of the record shows Ms. Manlove complied with the district court's directives regarding her dismissal motions; therefore, we find Ms. Manlove did not violate Rules 1.3 and 3.4(c) regarding any directive by the district court.

1. *Facts Relevant to Alleged Misconduct Involving the Mass Dismissal of Criminal Cases*

**Beginning of Ms. Manlove's Administration**

[¶83]  On Ms. Manlove's first day in office, there were four open attorney positions at the D.A.'s Office. To be fully staffed, the D.A.'s office needed ten attorneys. The previous administration had nine positions filled, but three attorneys left the D.A.'s Office to pursue other opportunities before the beginning of the new administration. Instead of retaining

the remaining six attorneys, Ms. Manlove retained only one attorney and fired the others.[14] She also fired several of the support staff, including legal assistants. Ms. Manlove immediately hired four attorneys, all of whom began working for the D.A.'s Office in early January 2019. Ms. Manlove's administration began with only five out of ten attorney positions filled.

[¶84] The attorney retained from the previous administration is the only attorney who had experience with the current caseload and her role was working on juvenile matters. One of the newly hired attorneys testified to her experience of having no previous knowledge of the pending caseload at the beginning of Ms. Manlove's administration:

> [SPECIAL BAR COUNSEL]: . . . . Give us a little review of how things started out in the Manlove administration.
>
> [ATTORNEY]: I think we were only at half staff when we first started, and it was a massive undertaking. You're putting new attorneys into an office that's existing. I think it's no secret that the -- the Laramie County district is the busiest criminal district [in] the State of Wyoming. I think one-third of the prosecutions were just on pace with Natrona County. And you're dropping folks into this environment, none of the names are familiar, none of the cases are familiar, and I believe there were six of us.
>
> And so getting your arms around a thousands-of-case caseload was quite a pill to swallow. And they say the only way to eat an elephant is one bite at a time, and so we jumped in and had kind of a man-to-man defense. At the time there were only three district court judges, three circuit court judges. We were each - - three of us were assigned each a circuit court judge that we sort of followed and stayed with. And then we would tag-team and have a pair of us with the district court judges.
>
> I would say working 18 hours a day during the week, and I don't know how many on the weekends. But it was a massive endeavor to just try to wrap your arms around the caseload, to work through, to get to know cases, where they were, to learn the evidence and learn a brand-new job. I mean, where I had come in before, I was very specifically assigned to a trial. I never had the experience of being handed a caseload. And so

---

[14] Ms. Manlove testified she fired four attorneys, but the human resources record indicates five attorneys had their last day on Ms. Manlove's first day in office, January 7, 2019.

it was like drinking from a fire hose.

[SPECIAL BAR COUNSEL]: Well, in your -- your first day of fire hose, what prior experience, knowledge, did you have of the cases then scheduled for some court activity?

[ATTORNEY]: None. I mean, walking in on day one was looking at the files for the first time. I mean, if -- if I'd heard about a case in the news, would be the only familiarity I had with it, but there was no -- I mean, I panicked before going into traffic court for the first time, which I know sounds silly. I had done homicide trials but didn't know how to do a speedy [sic] bench trial, so walking in and just having hundreds of cases suddenly assigned to you was overwhelming.

[¶85]  While none of Ms. Manlove's newly hired attorneys had any experience with the pending caseload or reviewed any cases before starting, Ms. Manlove testified she looked at the public files in the district court clerk's office before assuming office. She concentrated her efforts on reviewing the pleadings for felonies set for trial in January 2019. She testified from the best of her recollection there were "20 to 40 cases, depending on the judge, in each trial stack for January."

[¶86]  For the first four months of Ms. Manlove's administration, several of the pending criminal matters were either continued or dismissed and recharged. Additionally, during the first year of Ms. Manlove's administration, Ms. Manlove and the attorneys in her office reviewed a stack of uncharged probable cause affidavits from the previous administration. The record does not contain any details surrounding the stack of uncharged probable cause affidavits, including the reasons the matters were not yet charged.[15]

**Caseload Management Issues Begin in 2019**

---

[15] At the beginning of Ms. Manlove's term, she filed motions in pending criminal matters alleging the former District Attorney did not allow her a smooth transition into office and there was an "utter lack of adequate preparation any prudent lawyer would take in advance of trial [and she had] a good faith reason to believe there was a failure of the prosecutor(s) to perform due diligence as required by the Wyoming Rules of Professional Conduct." A grievance was filed against Ms. Manlove, and Ms. Manlove entered into a diversion agreement. In that diversion agreement, Ms. Manlove conceded she hastily filed the motions "without the due diligence that should have been done before making the allegations contained in the motions." We understand the record is not fully developed as to any allegations against the previous administration. We only provide this information as background of the underlying allegations against Ms. Manlove. Evidence as to Ms. Manlove's prior discipline was not considered in the first phase regarding whether she violated the Rules, but we do consider this evidence as an aggravating circumstance before determining any appropriate discipline. W.R.D.P. 15(b)(3)(A), (C).

[¶87] The testimony and exhibits indicate from the very beginning of Ms. Manlove's administration, the D.A.'s Office was having difficulty managing the caseload. The former office manager described the office during the first year of Ms. Manlove's administration as "chaotic." She testified "[i]t was constant chaos, and operationally, everyone was behind. It seemed as though nobody knew where anything was in terms of files, pleadings." The evidence further indicates from early 2019, Ms. Manlove and the D.A.'s Office were having issues with timely disclosing discovery. In June 2019, the district court noted in its order on Ms. Manlove's discovery violations for *State v. R.L.* (discussed in sub-section I above), that "this [was] the third case where providing timely discovery to a Defendant ha[d] been an issue before this court in the past month." The district court warned the D.A.'s Office that "[a]t some point the State's chronic failure to comply with discovery may become evidence which supports a finding of bad faith." A district court judge testified Ms. Manlove and her office developed a pattern of not being prepared, untimely drafting documents, failing to file documents, and failing to meet their obligations, which included showing up to court late and failing to appear in court.

**Work Environment Concerns**

[¶88] In addition to the case management issues, beginning in 2019, there were a number of ongoing personnel issues in the D.A.'s Office. Employees working under Ms. Manlove began reporting their concerns to the Human Resources Division and the Bar. One employee testified she reported Ms. Manlove because the work environment was hostile. A former attorney testified the work environment became increasingly more difficult in the fall of 2019.

[¶89] Approximately six months into Ms. Manlove's term, attorneys began seeking other employment. Within a four-month span at the end of 2020, five attorneys, including the majority of the attorneys Ms. Manlove hired at the beginning of her administration, terminated their employment at the D.A.'s Office. Attorneys and staff who left their employment during this timeframe testified they left because of Ms. Manlove's management and the work environment.

**The Pandemic and Budget Cuts**

[¶90] Around this time, additional challenges arose due to the global coronavirus pandemic. In April 2020, due to the direct and indirect effects of the pandemic on the State's budget, Wyoming Governor Mark Gordon issued a letter to all agency directors regarding budget reductions. The Governor implemented a three-phase approach for budget reductions. For phase 1, agencies were directed to re-examine their entire budget, adjust spending, and implement an immediate hiring freeze. During the hiring freeze, the Governor allowed review of specific requests to fill existing vacancies. His notification stated: "Vacancies and contracts may be brought to my attention on a case-by-case basis

where they are crucial necessities for the health, safety and welfare of the citizens of Wyoming."

[¶91]  For phase 2, the Governor directed each agency, including the D.A.'s Office, to prepare a budget proposal reducing their budget by 10% for the following biennium, fiscal years 2021–2022.  For phase 3, the Governor required agencies to prepare a supplemental budget reduction that **might** become necessary in the following biennium, 2021 to 2022. Agencies were required for phase 3 "to provide proposals for an additional 10% cut[] **should they become necessary.**" (Emphasis added).  The Governor's Office sent agencies, including Ms. Manlove, a memorandum explaining phrase 3 of the budget cut proposals were not mandated but instead were to aid the legislative branch in preparing a budget for the biennium.  This memorandum notified agencies that "supplemental budget requests are available . . . to request funding modifications that are considered emergency in nature."

[¶92]  In addition to the three-phase budget reduction, the Governor implemented a mandatory furlough day—an unpaid leave of absence—for all state employees at a level 11 or above.  The mandatory furlough required the attorneys in the D.A.'s Office to furlough one day a month.  The mandatory furlough was set to take place from August 2020 through January 2021.  However, the Governor cancelled the December 2020 and January 2021 mandatory furlough requirements.

[¶93]  For the D.A. Office's phase 2 budget reduction, Ms. Manlove proposed requiring employees to take an additional three furlough days a month.  However, on September 3, 2020, the policy director with the Governor's Office emailed Ms. Manlove and told her "not to implement the Step 2 budget reductions."  The policy director noted the cash flow savings from having a number of open positions at the D.A.'s Office were sufficient to cover the budget cuts, so it was not necessary for her office to implement phase 2.  The State Budget Department worked with Ms. Manlove to redevelop her supplemental phase 3 budget proposal.  The record indicates for possible phase 3 budget cuts, Ms. Manlove proposed eliminating a legal assistant position and requiring employees to furlough one day a month.  The Joint Appropriations Committee scheduled budget hearings to review any phase 3 proposals in December 2020.

[¶94]  Ms. Manlove testified she was notified on September 18, 2020, her budget for phase 2 would be reduced by 6% instead of 10%.  At this same time, she was notified she did not need to implement the phase 2 budget cuts because of her vacancy savings.  However, Ms. Manlove testified she required her employees to implement one furlough day beginning in September 2020 in anticipation of any supplemental budget cuts for phase 3.  The budget cuts for the D.A.'s Office remained at 6% until the following year when the Wyoming Legislature made an additional budget reduction of 0.5% or less to the D.A.'s Office budget during the legislative session.

**Mass Dismissal of Cases and Attempts to Become a Felony-Only Office**

[¶95]  Although Ms. Manlove was informed she did not need to implement budget cuts for phase 2 and her phase 3 supplemental budget cuts were not set for hearing until December 2020, she sent an email on September 14, 2020, to the Wyoming Budget Department, the Natrona County District Attorney, the Policy Director, Budget Policy Staff, and General Counsel and Deputy Chief of Staff at the Wyoming Governor's Office stating her office "w[ould] become a felony-only prosecutor's office" and would only "be able to continue to prosecute misdemeanor [d]omestic [v]iolence cases because although [the] grant-funding for those cases [was] cut, [her office could] still make it happen."  Three days later, she sent an email to the Natrona County District Attorney stating:

> I suspect that once folks know that the vast majority of misdemeanors cannot be prosecuted by my office due to budget cuts, including meth/heroin/cocaine crimes and how those will impact the safety of our citizens, that we will have public support for full funding.  And by 'full funding' I mean barely enough to keep our heads above water.

[¶96]  By September 18, 2020, Ms. Manlove knew the cash flow from the number of vacancies in her office covered the 6% budget cut imposed on the D.A.'s Office.  However, that day she sent an email to all the judges in the First Judicial District, the Attorney General's Office, the Laramie County Attorney's Office, the City Attorney's Office, the U.S. Attorney's Office, and several other agency heads, stating that based on the budget cuts, the "level of service" the D.A.'s Office had provided was no longer an option.  She stated: "in the coming weeks [her office would] be forced to dismiss cases because of the budget cuts."  She further stated her office would "be unable to prosecute cases that d[id] not meet [her] priority standards of violent felonies, domestic violence, subsequent DUIs, and felony drug crimes."  She also stated as of October 1, 2020, she would no longer initiate certain juvenile matters (child in need of supervision cases and educational neglect cases), and her office would not draft certain orders.  She further stated: "[I] fear that these cuts will create the most serious public safety issue our community has faced in modern times."  In her email, Ms. Manlove stated the drastic reduction in services was due to budget cuts and falsely asserted "the Governor's Office has informed all Executive Branch agencies to submit an additional 20% in proposed budget cuts."

[¶97]  Before sending this email, Ms. Manlove was aware her phase 2 budget cut was satisfied, and her phase 3 supplemental budget cut was only a proposal that would be reviewed in approximately three months.  At the time of her email the only budget reduction in effect was the requirement for level 11 employees to take one furlough day in September, October, and November 2020.  Yet, Ms. Manlove informed the attorneys in the D.A.'s Office she was going to dismiss cases due to budget cuts and to get the caseloads down to a more manageable number.

[¶98] Ms. Manlove required the attorneys in her office to review their caseloads and submit to her a list of approximately 75 cases to keep, and the remaining cases she would consider dismissing. One attorney testified it was not possible to fully review each case and the underlying evidence with the attention necessary to decide whether the case should be dismissed. After reviewing the lists, Ms. Manlove made the final decision on what cases to dismiss, and she even dismissed some cases her staff wanted to continue prosecuting because those cases did not fit into her priority policy. Legal assistants were directed to draft motions to dismiss in the cases Ms. Manlove decided to dismiss. Ms. Manlove reviewed and signed (or used her signature stamp) the motions in all cases that were allegedly dismissed for budgetary reasons.

[¶99] Beginning October 1, 2020, Ms. Manlove dismissed several hundred cases purportedly "in connection with budget impacts." She stopped staffing the treatment court with a prosecutor while being fully aware the statutes required a prosecutor to participate in treatment court proceedings. Additionally, she dismissed several matters initiated by a citation, including citations for a first offense of driving under the influence, which she was required by statute to prosecute. Wyo. Stat. Ann. § 31-5-233(j) (LexisNexis 2021). When dismissing cases, Ms. Manlove filed a motion to dismiss "without prejudice, for the reason indicated in the attached letter." Similar to Ms. Manlove's email on September 18, 2020, the letter indicated that the D.A.'s Office would be cutting its level of service, and the request for dismissal was due to budget reductions.

[¶100] We cannot discern from the record the exact number of cases Ms. Manlove dismissed or declined to prosecute based on her claim of budget reductions. Special Bar Counsel's evidence showed 17 cases were dismissed at the district court level for alleged "budget" reasons, but that number did not include the cases she dismissed in December 2020 for alleged budget cuts. Instead of including the attached budget cut letter, the December 2020 dismissal motions only referenced the dismissals were necessary "in the interests of justice." Regarding the dismissals in circuit court, Special Bar Counsel provided a list of cases that were dismissed, but that list does not indicate which of those cases were dismissed purportedly for budget cuts. While we are unable to determine how many matters were actually dismissed in district court and circuit court for budgetary reasons, Ms. Manlove admitted to dismissing roughly 400 to 410 cases for budgetary reasons. We accept Ms. Manlove's testimony and find she dismissed approximately 400 cases.

[¶101] We are also unable to determine from the record how many cases Ms. Manlove declined to prosecute alleging "budgetary reasons," which includes her decision to stop filing child in need of supervision cases.[16] One attorney testified that as new cases were

---

[16] Wyoming Statute § 14-6-411 mandates the district attorney in a child in need of supervision matter to "determine whether the best interest of the child requires that judicial action be taken."

continuing to come in, Ms. Manlove directed them to dismiss several citations, even before the initial appearance. The attorney covering juvenile matters testified the D.A.'s Office declined to file certain juvenile matters during this time, which were mostly child in need of supervision cases.

[¶102] Regarding the mass dismissals, one circuit court judge testified:

> After October 1st, one of those stacks on my desk was motions to dismiss, and it would go from one or two a day to three, four, five to a stack. And that was on my desk, [and the two other circuit court judges] desk. Day after day, week after week cases just being dismissed, dismissed, dismissed. Cases that had already been dismissed, cases where somebody had already pled guilty and a judgment and sentence was entered get a motion to dismiss on that case. Cases where a person is cited for, say, a $90 traffic ticket, and it's a may forfeit bond ticket -- in other words, you and I get a speeding ticket, you can pay 90 bucks and keep from coming to court -- those were dismissed before the person even came to court.
>
> Property crimes. Property crimes where the only avenue a victim would ever get restitution is when they may get a restitution award through a criminal judgment. These were broad, broad categories of cases that were just -- the determination was not to prosecute.

[¶103] Similarly, in district court Ms. Manlove filed dismissals alleging budget reasons in a broad array of cases and in cases where a defendant had already pled guilty, or a judgment and sentence was entered. Ms. Manlove filed motions to dismiss in several district court cases allegedly due to budget reductions, but those matters had been pending for over a year, long before budget reductions were even discussed. These cases involved stolen vehicles, possession of methamphetamine, and embezzlement. In one case, Ms. Manlove filed a motion to dismiss where the defendant was already convicted and serving his sentence. The district court judge overseeing the matter testified the motion to dismiss was filed in "a matter in which the defendant had been serving a term of supervised probation for two and a half years," and procedurally there was nothing for the court to dismiss. During a hearing on the matter, Ms. Manlove admitted the motion was filed in error, and the district court explained to the defendant his criminal conviction was not going to be dismissed.

[¶104] In a separate matter, Ms. Manlove filed a motion to dismiss where a defendant already pled guilty and was in jail awaiting sentencing. The district court held a hearing and Ms. Manlove stated the motion to dismiss was filed in error and instead she meant to

45

file a petition to revoke bond. The district court noted on the record that the D.A.'s Office had already filed a petition to revoke bond prior to filing the motion to dismiss, and the defendant had already been picked up on a warrant and was in jail awaiting sentencing. The presiding judge testified Ms. Manlove's actions showed inattention and that "she didn't read the file before that hearing to know that the defendant was already in jail on a petition to revoke his bond, and [it] border[ed] on making a material misrepresentation to the [c]ourt to say we intended to file a petition to revoke bond when, in fact, one had already been filed."

**Wyoming Highway Patrol and Wyoming Game and Fish Citations**

[¶105] In Ms. Manlove's motions to dismiss, she indicated "law enforcement agencies [would] have to shoulder the burden of prosecuting all nonpriority [cases]," which caused the Wyoming Highway Patrol and Laramie County Sheriff's Department to contact the circuit court to determine what they needed to do for officers to prosecute their own cases. The district court and circuit court judges were concerned Ms. Manlove was encouraging the unauthorized practice of law by suggesting law enforcement prosecute their own citations. During the disciplinary hearing, Ms. Manlove testified her statement "[l]ocal law enforcement agencies will have to shoulder the burden of prosecuting all non-priority offenses and prosecutors will no longer appear in court for those cases [meant] that the attorney who represents that particular agency would be acting as the prosecutor[.]" The record is replete with evidence and testimony that contradict Ms. Manlove's statements.

[¶106] The testimony indicates Ms. Manlove asked two circuit court judges and the Wyoming Highway Patrol about officers prosecuting their own matters. In an e-mail Ms. Manlove sent to the Wyoming Highway Patrol, she wrote: "Has your Agency discussed with Circuit Court and the judges the possibility of the Troopers prosecuting their own citations? Short of that, we will not be able to keep up with the WHP's citations because of the impact of the budget cuts to our office." A colonel with the Wyoming Highway Patrol responded:

> I have not personally spoken with any of the circuit court judges about Troopers representing their violations before the court. However, I have spoken with the Attorney General's Office on multiple occasions and they have discussed this with the circuit court judges. It is my understanding that state law does not provide for a law enforcement officer to represent their case to the court, like it does for a prosecutor. Troopers are simply witnesses. Therefore, we will not be proceeding with this concept.

[¶107] Ms. Manlove also requested the Wyoming Highway Patrol notify her about cases before a citation is issued, and she stated that if her office was not notified of the citation

46

prior to its issuance she would outright dismiss the matter. The Wyoming Highway Patrol responded:

> If I understand your request for relief correctly, you are asking the [Wyoming Highway Patrol] to not enforce the law. As I indicated in our meeting on October 7, 2020, my Troopers and [port-of-entry] Officers already exercise an appropriate amount of discretion during enforcement. However, they are sworn to uphold the laws of this state and nation and this is exactly what I expect and have told them to do. I cannot and will not tell them to not perform their sworn duties.

[¶108] Prior to her e-mail to the Wyoming Highway Patrol, Ms. Manlove informed the circuit court she wanted to obtain a list of cases initiated by citation prior to the defendants making their appearance in court, in order to file a motion to dismiss before the scheduled court appearance. The circuit court denied Ms. Manlove's request to obtain such a list.

[¶109] When hundreds of cases that involved tickets issued by the Wyoming Highway Patrol and the Wyoming Game and Fish were not getting prosecuted in circuit court, as a result of Ms. Manlove's refusal to prosecute them, the Wyoming Attorney General approached the district court for a solution. The Attorney General asked the district court to assign the Attorney General's Office to prosecute all the matters that were not getting prosecuted in circuit court by the D.A.'s Office. After reviewing its statutory authority, the district court found it was unable to make such a broad assignment of matters to the Attorney General's Office.

**District Court and Circuit Court Judges Report Ms. Manlove's Conduct to the Bar**

[¶110] After witnessing a culmination of concerning events, the district court and circuit court judges met to discuss what each had witnessed in their respective caseloads from the D.A.'s Office. Based on that meeting, all seven of the judges had a "collective belief [Ms. Manlove] wasn't fulfilling her professional responsibilities," and they concluded it was their ethical obligation to report her conduct to the Bar for investigation pursuant to Rule 2.15 of the Wyoming Code of Judicial Conduct. The judges' primary concerns were Ms. Manlove's personnel management and her caseload management.

[¶111] The district court and circuit court judges testified to concerns regarding Ms. Manlove's case management. A district court judge testified a pattern had developed with Ms. Manlove's office that "justified the statement that she's not meeting her professional responsibilities," including attorneys failing to appear in court and her office consistently failing to meet obligations. Another district court judge confirmed Ms. Manlove failed to appear at some scheduled hearings, including a probation revocation that was dismissed due to the prosecutor's failure to appear. Several judges shared the sentiment that they did

not believe budget cuts were the cause of the mass dismissal of cases. A district court judge testified Ms. Manlove's decision to cut services and dismiss cases "was grossly disproportionate to a 10 percent or less budget cut to her office." A circuit court judge testified the concern was "that Ms. Manlove had so mismanaged her caseload that she was no longer able to prosecute . . . nonpriority offenses and . . . she was taking a fairly unprecedented step of suggesting that" other agencies had the burden of doing what she would not.

[¶112] Based on all of the conduct observed and the totality of the circumstances, the district court and circuit court judges jointly wrote a letter and reported their concerns to the Bar. In the first formal charge, Special Bar Counsel alleged Ms. Manlove's conduct regarding the wholesale dismissal of cases and a drastic reduction in the level of services provided by the D.A.'s Office as described in the judges' joint letter violated Rule 8.4(d). We agree.

### 2. *Mass Dismissal of Cases and Violation of Rule 8.4(d)*

[¶113] Under the first element of the *Owusu* test, we find clear and convincing evidence established Ms. Manlove acted improperly in mass dismissing cases, filing dismissals in cases where the offender was awaiting sentencing, filing dismissals when the offender was already sentenced, failing to appear in court, failing to timely file documents, failing to properly manage her caseload, and drastically reducing the level of services provided by the D.A.'s Office. The evidence established Ms. Manlove grossly mismanaged her caseload, which caused a large backlog of cases. The backlog of cases was then exacerbated by the pandemic and budget cuts.

[¶114] We find, in an effort to address the backlog, Ms. Manlove dismissed cases en masse and falsely alleged in court filings it was due to "budgetary restraints." She further discontinued several services provided by the D.A.'s Office.

[¶115] Ms. Manlove was informed prior to her mass dismissal of cases that her phase 2 budget cut of 6% was already met, yet she proceeded to dismiss approximately 400 cases, including several matters that had been pending for more than a year in district court. She stopped staffing treatment courts with a prosecutor, filing child in need of supervision cases, and attempted to stop prosecuting first offense driving under the influence matters. The attorney who was handling misdemeanor prosecutions at the time of the mass dismissals testified he did not agree the office needed to cut as many cases as it did, and he could have kept up with his caseload even when taking two furlough days a month. We agree with the Hearing Panel and find Ms. Manlove exaggerated the impact of budget restraints and prematurely directed the wholesale dismissal of cases without considering the merits of each individual case, as evidenced by her filing of motions to dismiss in matters the defendant had already pled to the charge or had been convicted. We further agree Ms. Manlove unjustifiably made a drastic reduction of the services historically and

statutorily required to be provided by the D.A.'s Office.

[¶116] The second element of the *Owusu* test is also satisfied. Ms. Manlove's conduct bears directly upon the judicial process with respect to an identifiable tribunal. *See Hinckley*, 2022 WY 18, ¶ 72, 503 P.3d at 611 ("[T]he conduct involved bears directly upon the judicial process (i.e., the administration of justice) with respect to an identifiable case or tribunal."). Ms. Manlove's conduct negatively impacted the Laramie County Circuit Court and the Laramie County District Court. W.R.P.C. 1.0(n).[17]

[¶117] To satisfy the third element of the *Owusu* test, Ms. Manlove's conduct must have "at least potentially impacted upon the process to a serious and adverse degree." *Hinckley*, 2022 WY 18, ¶ 72, 503 P.3d at 611. Lawyers holding public office are held to a higher standard of conduct than other attorneys. W.R.P.C. 8.4 cmt. [5] ("Lawyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of lawyers."); *State ex rel. Neb. State Bar Ass'n v. Rhodes*, 453 N.W.2d 73, 90 (Neb. 1990) ("[T]he conduct of a government attorney is required to be more circumspect than that of a private lawyer because improper conduct on the part of such an attorney reflects upon the entire system of justice in terms of public trust."). The Wyoming Rules of Professional Conduct serve the common goal of safeguarding public confidence in the justice system. *See* W.R.P.C. Preamble [6]. "Conduct is prejudicial to the administration of justice when it 'reflects negatively on the legal profession and sets a bad example for the public at large' or is 'likely to impair public confidence in the profession, impact the image of the legal profession and engender disrespect for the court.'" *Att'y Grievance Comm'n of Md. v. White*, 280 A.3d 722, 758 (Md. 2022) (quoting *Att'y Grievance Comm'n v. Daley*, 262 A.3d 257 (Md. 2021)).

[¶118] Ms. Manlove's conduct negatively impacted the public's perception of the criminal justice system in a serious and adverse way and cannot be ignored. "[T]he goal of the criminal justice system is the attainment of justice, [and] the role of the prosecuting attorney differs from that of an advocate in a civil case." *Lafond v. State*, 2004 WY 51, ¶ 31, 89 P.3d 324, 334 (Wyo. 2004); *Att'y Grievance Comm'n of Md. v. McDonald*, 85 A.3d 117, 144 (Md. 2014) ("Prosecutors must be held to even higher standards of conduct than other attorneys due to their unique role as both advocate and minister of justice.").

> The prosecutor is the representative of [Wyoming] whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a

---

[17] We note testimony indicates the Cheyenne Police Department began citing cases for violation of city ordinances to be prosecuted in municipal court, instead of citing the cases to be prosecuted in circuit court, as they previously were. Ms. Manlove testified she never met with the city attorney before she implemented her priority case policy. The record is unclear how this possibly impacted the operation of the municipal court and the city attorney's office.

49

> criminal prosecution is not that it shall win a case, but that **justice shall be done.** As such, [the prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that **guilt shall not escape or innocence suffer**. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.

*Lafond*, ¶ 31, 89 P.3d at 334 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)) (emphasis added); *Matter of BJB*, 888 P.2d 216, 220 (Wyo. 1995) (Cardine, J. dissenting) ("Justice delayed is justice denied—slow justice is no justice.").

[¶119] Dismissing approximately 400 cases due to a backlog caused by her own decision-making and falsely citing budgetary reasons to conceal her gross mishandling of her office's caseload reflects negatively on the legal profession, impairs public confidence in the justice system, fails to ensure justice is done, and engenders a disrespect for the judicial system. We agree there is clear and convincing evidence Ms. Manlove's conduct violated Rule 8.4(d). *See generally Hinckley*, 2022 WY 18, ¶ 73, 503 P.3d at 612; *People v. Payne*, No. 22PDJ033, 2022 WL 4392878, at *1–2 (Colo. O.P.D.J. Sept. 21, 2022) (finding a Rule 8.4(d) violation when an elected district attorney accumulated a significant backlog of cases and failed to act for months on matters involving serious crimes); *White*, 280 A.3d at 758–59 (finding an attorneys conduct was prejudicial to the administration of justice when he made knowing and intentional misrepresentations to cover up his misconduct and engaged in a pattern of filing frivolous and untimely motions); *Iowa Supreme Court Att'y Disciplinary Bd. v. Kingery*, 871 N.W.2d 109 (Iowa 2015) (finding a Rule 8.4(d) violation when an attorney neglected criminal matters and caused numerous delays). We further find Ms. Manlove's mass dismissal of cases due to her own caseload mismanagement violates her duty of competence under Rule 1.1 and her duty of diligence under Rule 1.3.

[¶120] Ms. Manlove argues her acts were within her prosecutorial discretion and any discipline from this Court for those acts violates the separation of powers. This Court does not seek to impair the exercise of prosecutorial authority or discretion by its decision. Our ruling does not touch upon Ms. Manlove's charging decisions or personnel decisions.

[¶121] "[I]t has been well settled by the rules and practice of common law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and [counselor], and for what cause [s]he ought to be removed." *Ex parte Garland*, 71 U.S. 333, 379, 18 L. Ed. 366 (1866) (quoting *Ex parte Secombe*, 60 U.S. 9, 13, 15 L. Ed. 565 (1856)). "Prosecutors and their deputies must follow the Rules of Professional Conduct in . . . acts involving prosecutorial discretion, and they may be disciplined by this Court when they fail to do so." *In re Flatt-Moore*, 959 N.E.2d 241, 246 (Ind. 2012); *see generally Hinckley*, 2022 WY 18, ¶¶ 6–99, 503 P.3d at 594–620; *In re*

*Neely*, 2017 WY 25, ¶¶ 38–53, 390 P.3d 728, 741–46 (Wyo. 2017) (finding the provisions of the Wyoming Constitution permit the Court to discipline a municipal court judge for violating the Wyoming Code of Judicial Conduct). Ms. Manlove concedes she is subject to the Wyoming Rules of Professional Conduct. It is within our inherent authority to determine whether her conduct violates those Rules and what sanction to impose for her violation of those Rules. Wyo. Const. art. V, §§ 1, 3; *Hinckley*, ¶ 2, 503 P.3d at 592–93; Wyo. Stat. Ann. § 5-2-118(a).

[¶122] We are sympathetic that prosecutors' offices have high caseload demands and are impacted by budgetary restraints and staffing issues, which impact their ability to prosecute caseloads. To address such issues, Standard 3-1.8 of the ABA Standards for Criminal Justice provides: "[i]f workload exceeds the appropriate professional capacity of a prosecutor or prosecutor's office, that office or counsel should . . . alert the court(s) in its jurisdiction and seek judicial relief." The Wyoming Legislature provides several avenues for a prosecutor to seek assistance should their caseload exceed the office's professional capacity. *See, e.g.*, Wyo. Stat. Ann. § 1-31-106 (LexisNexis 2021) ("When the office of county attorney is vacant or when the county attorney is absent, interested in the action or disabled from any cause, the court may direct or permit any member of the bar to act in his place to bring and prosecute the action."); Wyo. Stat. Ann. § 9-1-805 (LexisNexis 2021) ("When the district attorney is interested or refuses to act in a prosecution, the court may direct or permit any member of the bar to act in the district attorney's place."); Wyo. Stat. Ann. § 9-1-810 (LexisNexis 2021) ("Each district attorney may request the assistance of the county attorneys in his district in the preparation, prosecution and argument of criminal matters arising in any county within his district and each county attorney shall render aid and assistance as requested by the district attorney."); Wyo. Stat. Ann. § 9-1-603(d) (LexisNexis 2021) ("When requested by a county or district attorney, the attorney general may assign a member of his staff who is experienced in trial work and in the prosecution of criminal cases to assist in the prosecution of a felony."); *Cf. Lozano v. Cir. Ct. of Sixth Jud. Dist.*, 2020 WY 44, ¶ 41, 460 P.3d 721, 733 (Wyo. 2020) (finding Wyo. Stat. Ann. § 7-6-105(b) affords the public defender discretion to decline an appointment or appointments).

[¶123] Ms. Manlove did not fully utilize those avenues and instead dismissed cases en masse while simultaneously deciding not to prosecute other categories of cases. Her actions are a complete refusal to perform the duties imposed upon her as the District Attorney.

> After the utterance of [the] oath, [a district attorney] cannot sit down with folded hands and arms, and refuse to perform the duties imposed upon him, solely upon the ground that the sentiment of the community or county in which he resides is in opposition to the enforcement of the criminal laws of the state; such action upon his part would tend to increase lawlessness.

51

Under such a doctrine, the more lawless the community, the less the criminal prosecutions. Such action would be a temptation for malefactors to create sentiment against the criminal laws, and to a great degree the law-loving and law-abiding citizens would be at the mercy of the vicious and criminal classes. The state owes the duty to its citizens to protect them in the full enjoyment of all their rights . . . .

\* \* \*

If a [district] attorney . . . has the discretion to say he will not attempt to enforce the prohibitory law in his county, he has also the discretion to refuse to enforce the statute relating to murder, larceny, forgery, and the other crimes. It cannot be that a [district] attorney has such discretion or power. If it were so decided, "twill be recorded for a precedent, and many an error, by the same example, will rush into the state." If a law enacted by the legislature has not the support of public sentiment, this may be, under some circumstances, a reason for its amendment or repeal, but it is not a good defense for a [district] attorney, upon whose lips is fresh the oath of office, for refusing to attempt its enforcement.

*State ex rel. Johnston v. Foster*, 3 P. 534, 537–38 (Kan. 1884), *aff'd sub nom. Foster v. Kan. ex rel. Johnston*, 112 U.S. 201, 5 S. Ct. 8, 28 L. Ed. 629 (1884), and *aff'd sub nom. Foster v. State of Kan. ex rel. Johnston*, 112 U.S. 205, 5 S. Ct. 97, 28 L. Ed. 696 (1884).

[¶124] Likewise, budgetary reasons are not an excuse for a district attorney to dismiss approximately 400 cases and decline to prosecute categories of cases, especially when the backlog of cases was caused, in part, by that attorney's own mismanagement. We find Ms. Manlove's mass dismissal of cases and drastic reduction in the level of services provided by the D.A.'s Office were a gross miscarriage of justice and a dereliction of her duties, and it was not an exercise of her prosecutorial discretion. *See generally Petition of Padget*, 678 P.2d at 873 ("Once the decision to prosecute has been made, then the judiciary becomes involved, but not before."); Wyo. Stat. Ann. § 9-1-804(a)(i). We therefore find Ms. Manlove's conduct violated Rule 8.4(d) and warrants the imposition of sanctions.

### 3. *Failure to Comply with Court Direction to Stop Filing Extraneous Budgetary Information with Dismissals*

[¶125] As a separate finding related to Ms. Manlove's mass dismissals, the Hearing Panel found clear and convincing evidence established Ms. Manlove violated Rules 1.3 and 3.4(c). The Hearing Panel found the district court warned Ms. Manlove to discontinue

including the budgetary language in her motions to dismiss, and she failed to comply with the court's directives. We have reviewed the record and disagree with the Hearing Panel. The record does not contain clear and convincing evidence that Ms. Manlove failed to comply with a judicial directive. The record contains evidence of one district court judge continually striking the budgetary letter, but the orders to strike did not direct Ms. Manlove to stop filing the motions or including the budgetary language in those motions. Instead, the record reflects Ms. Manlove was informed why the letter was stricken on November 23, 2020, when another district court judge held a show cause hearing. During the show cause hearing, the district court informed Ms. Manlove it was improper to include the letter and extraneous budget information in the motions because it went well beyond the individual case. Ms. Manlove indicated she understood and going forward she would simply file motions to dismiss the cases in the interests of justice. The district court judge testified Ms. Manlove did not file the extraneous budgetary information in any future filing. From what we observed in the record, Ms. Manlove was never ordered to discontinue filing the motions, and she did not include the budget language in her December motions to dismiss. We therefore decline to find Ms. Manlove violated Rules 1.3 or 3.4(c) through any failure to follow the district court's directives to stop filing the motions to dismiss.

## DISCUSSION OF SANCTIONS

[¶126] Having found Ms. Manlove violated Rules 1.1, 1.3, 3.3(a), 3.4(c), 8.1(a), and 8.4(d), for her acts or omissions in *State v. R.L.*, Case No. 20-47759, Criminal Action No. CR 2019-1739, and in her case management, we move to the issue of what sanction to impose for her conduct. Disciplinary proceedings before the BPR are bifurcated. W.R.D.P. 15(b). The first phase requires the BPR to receive evidence and determine whether a violation of the Rules occurred. W.R.D.P. 15(b)(3). If by a majority the Hearing Panel determines there has been a violation, "the Hearing Panel shall [in the second phase or disciplinary phrase] receive evidence of aggravating or mitigating circumstances before determining the appropriate discipline[.]" W.R.D.P. 13(b)(3)(C). During the second phase, "[e]vidence of prior discipline against the respondent shall be admissible" to determine the appropriate discipline. *Id.* "Like in the first phase of the disciplinary proceeding, factual matters in the sanctions phase must be proven by clear and convincing evidence." *Hinckley*, 2022 WY 18, ¶ 75, 503 P.3d at 612.

[¶127] The Hearing Panel recommended disbarment. We review its sanction recommendation de novo and make the ultimate determination of what sanction to impose. W.R.D.P. 15(b)(3)(F); W.R.D.P. 16; *Hinckley*, 2022 WY 18, ¶ 76, 503 P.3d at 612. In *Hinckley*, we reminded the Hearing Panel to "separately set out its factual findings relevant to each part of the bifurcated proceeding[,]" so we could adequately understand what factual findings were relevant to the sanction. The report and recommendation in this case separated out its factual findings for the disciplinary phase, but it did not specifically connect those findings to the disciplinary standards listed in its conclusions of law.

53

[¶128] "In imposing a sanction after a finding of lawyer misconduct," we consider the following:

> (i) Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
>
> (ii) Whether the lawyer acted intentionally, knowingly, or negligently;
>
> (iii) The amount of the actual or potential injury caused by the lawyer's misconduct; and
>
> (iv) The existence of any aggravating or mitigating factors.

W.R.D.P. 15(b)(3)(D); *see also ABA Standards for Imposing Lawyer Sanctions* § 3.0 (ABA Standards).

[¶129] Under factor (ii), we look to the lawyer's mental state to determine whether the lawyer acted intentionally, knowingly, or negligently at the time of her misconduct. ABA Standards § 3.0, Commentary. The lawyer's mental state at the time of the misconduct sets forth "the degree of the lawyer's culpability for disciplinary purposes." American Bar Association, *Annotated Standards for Imposing Lawyer Sanctions* 133 (Ellyn S. Rosen, 2d ed. 2019) (Annotated Standards). Acting with intent is the most culpable mental state and arises when a lawyer acts with "the conscious objective or purpose to accomplish a particular result." *Hinckley*, 2022 WY 18, ¶ 78, 503 P.3d at 612–13 (citing ABA Standards, Definitions); Annotated Standards at 134. The next most culpable mental state, knowledge, occurs when a lawyer acts with "the conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result." *Hinckley*, ¶ 78, 503 P.3d at 612–13; Annotated Standards at 135. "The least culpable mental state is negligence." Annotated Standards at 136. "'Negligence' is . . . the failure of the lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Hinckley*, ¶ 78, 503 P.3d at 612–13.

[¶130] For factor (iii), we look at the injury or potential injury, which need not be actually realized, resulting from the lawyer's misconduct, in order to protect the public. ABA Standards § 3.0, Commentary. "'Injury' is [the] harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury or 'little to no' injury." *Hinckley*, 2022 WY 18, ¶ 78, 503 P.3d at 613 (citing Definitions, ABA Standards). "'Potential injury' is the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." *Id.*

[¶131] The ABA standards "are grouped in terms of whether the duty violated by the lawyer was owed to the client, the public, the legal system, or the profession [and] set[s] out specific considerations for each type of violation." *Id.* at ¶ 79, 503 P.3d at 613. Each standard also sets forth a presumptive sanction for each violation of a model rule of professional conduct. *See* ABA Standards, Appendix 1. We address Ms. Manlove's specific instances of misconduct using the format adopted in the ABA Standards.

## I. *Violations of Duties Owed to the Client—Rule 1.1 and 1.3 Violations*

[¶132] As the elected District Attorney, Ms. Manlove's client was the State of Wyoming, and her responsibilities were those "of a minister of justice." W.R.P.C. 3.8 cmt. [1]; *see also* Wyo. Stat. Ann. § 9-1-804(a). Prosecutors are held to an even higher standard of conduct than other attorneys because their unique role is to ensure justice for the public. *Lafond*, 2004 WY 51, ¶ 31, 89 P.3d at 334; W.R.P.C 8.4 cmt. [5]. In reviewing the record, we found Ms. Manlove's conduct in *State v. R.L.*, Case No. 20-47759, and her mass dismissal of cases and drastic reduction of services violated her duty of competence under Rule 1.1 and her duty of diligence under Rule 1.3. We find Ms. Manlove's conduct in *State v. R.L.*, was negligent, her conduct in Case No. CR 20-47759 was intentional, and her dismissal of cases en masse and reduction of services was intentional.

[¶133] Under ABA Standard 4.5, disbarment is generally appropriate for violations of the duty of competence under Rule 1.1, "when a lawyer's course of conduct demonstrates that the lawyer does not understand the most fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client." Since disbarment is such a serious sanction, the ABA recommends imposing disbarment "on lawyers who are found to have engaged in multiple instances of incompetent behavior." ABA Standard § 4.51, Commentary. Ms. Manlove engaged in multiple instances of incompetent behavior: her failure to timely disclose evidence resulted in the dismissal of serious criminal allegations against an alleged habitual criminal; her delay and failure to obtain, review and assess evidence in an alleged child sexual abuse case caused severe stress to a victim and her family, and delayed the prosecution of a serious criminal matter; and her mass dismissal of hundreds of criminal cases and drastic reduction in services provided by the D.A.'s Office potentially caused serious harm to the public, the legal system, and the judicial system. The record further demonstrates Ms. Manlove's continued inattention to pending matters. Specifically, she moved to dismiss criminal matters in which the defendant had already been sentenced or was awaiting sentencing. After reviewing ABA Standard 4.5, we find disbarment is the presumptive sanction for Ms. Manlove's multiple violations of Rule 1.1, the impact her conduct had on victim's seeking justice, and the impact her conduct potentially had on the public's perception of the justice system.

[¶134] Under ABA Standard 4.4, disbarment is appropriate if a lawyer violates Rule 1.3 by abandoning their practice and leaving a client without any legal remedy or by engaging in

a pattern of misconduct that demonstrates the lawyer's inability to conform to the required ethical standards. *Id.* Ms. Manlove's conduct shows she neglected criminal matters and caused serious injury to the State of Wyoming and its citizens. Her conduct caused similarly situated criminal defendants to be treated differently, left victims without recourse, and resulted in the dismissal of serious criminal allegations with no justice delivered. The extent of Ms. Manlove's neglect is extreme and is a gross deviation from the conduct expected from an attorney. We find disbarment is the presumptive sanction for Ms. Manlove's violations of Rule 1.3.

## II. Violations of Duties Owed to the Public and the Profession—Rule 8.1(a) Violations

[¶135] In Case No. 20-47759, we found Ms. Manlove violated her duty of integrity to the profession by "knowingly making a false statement of material fact" in connection with a disciplinary proceeding. W.R.P.C. 8.1(a). With respect to Ms. Manlove's conduct, we can apply either ABA Standard 5.1 or 7.0. *See* ABA Standards, Appendix 1. Under Standard 7.0, suspension would be appropriate, because disbarment is only appropriate if the attorney acts "with the intent to obtain a benefit for the lawyer or another." ABA Standards § 7.1; ABA Standards § 7.2, Commentary ("Suspension is appropriate when the lawyer knowingly violates a duty owed to the profession and causes injury or potential injury to a client, the public, or the legal system, even when a lawyer does not intentionally abuse the professional relationship by engaging in deceptive conduct."). Here, there is not clear and convincing evidence Ms. Manlove acted with an intent to obtain a benefit for herself or another.

[¶136] Under ABA Standard 5.1, "[d]isbarment is . . . appropriate when a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." One of the most fundamental professional obligations of an attorney is the duty to maintain personal honesty and integrity. ABA Standards § 5.11, Commentary. "The requirement of honesty is foundational to our judicial system and to our society." *Hinckley*, 2022 WY 18, ¶ 36, 503 P.3d at 602. A lawyer who engages in any intentional conduct involving dishonesty, deceit or misrepresentation "violate[s] one of the most basic professional obligations to the public." Annotated Standards at 238.

[¶137] Ms. Manlove publicly disparaged and falsely placed blame on law enforcement for her failure to timely review the lab results in Case No. 20-47759. We find Ms. Manlove acted intentionally to conceal her lack of due diligence in reviewing the case. *See generally In re Disciplinary Action Against McDonagh*, 822 N.W.2d 468, 471 (N.D. 2012) ("[D]ifference between 'knowledge' and 'intent' is a 'conscious objective or purpose to accomplish a particular result.'"). Had Ms. Manlove acted in a more diligent manner, thoughtfully read the police report, and accessed the results on BEAST, as the rest of the attorneys in her office did, she would have had the results and possibly made a timelier

charging decision. Ms. Manlove's intentional deception "adversely reflects on [her] fitness to practice." ABA Standards § 5.11(b). Public confidence in the integrity of the criminal justice system is essential. We cannot tolerate any conduct that promotes distrust of lawyers and disrespect for our system of justice. We therefore find disbarment is the presumptive sanction for Ms. Manlove's violation of Rule 8.1(a).

### III. *Violations of Duties Owed to the Legal System—Violations of Rules 3.3(a), 3.4(c) and 8.4(d)*

[¶138] By violating Rules 3.3(a), 3.4(c) and 8.4(d), Ms. Manlove violated the duties she owes to the legal system. "The public expects lawyers, as officers of the court, to abide by the substantive and procedural rules and laws." Annotated Standards at 307. A lawyer is not allowed to intentionally "make a false statement of fact or law." *Id.*

[¶139] Ms. Manlove violated her duty of candor to the tribunal under Rule 3.3(a) in *State v. R.L.*, by knowingly misleading the district court about the reasons for her failure to disclose critical evidence, which had been in her possession for more than two months. In that same matter, she violated her duty of fairness to the opposing party under Rule 3.4(c) by "knowingly disobey[ing] an obligation under the rules of a tribunal[.]" Lastly, we found Ms. Manlove violated Rule 8.4(d) in *State v. R.L.*, Case No. 20-47759, Criminal Action No. 2019-1739, and by dismissing approximately 400 pending criminal cases and drastically reducing services traditionally and statutorily provided by the D.A.'s Office.

[¶140] Ms. Manlove's violations of Rules 8.4(d) and 3.3(a) fall under ABA Standard 6.1, which is conduct that involves dishonesty, fraud, deceit, and misrepresentations to a court. Her violation of Rule 3.4(c) falls under ABA Standard 6.2, which is conduct that abuses the legal process. Rule 8.4(d) violations also fall under ABA Standard 6.2, which is conduct "involving [the] failure to expedite litigation . . . or failure to obey any obligation under the rules of the tribunal[.]" ABA Standards § 6.2.

[¶141] Under ABA Standard 6.2, suspension would be appropriate for Ms. Manlove's conduct, because disbarment is only appropriate if the attorney acts "with the intent to obtain a benefit for the lawyer or another." ABA Standards § 6.21; ABA Standards § 6.22 ("Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding."); *Hinckley*, 2022 WY 18, ¶ 87, 503 P.3d at 615. The record does not contain clear and convincing evidence Ms. Manlove acted with any intent or conscious objective to obtain a benefit for herself or another, aside from possibly attempting to obtain full funding for the D.A.'s Office.

[¶142] Under ABA Standard 6.1, "[d]isbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury

to a party, or causes a significant or potentially significant adverse effect on the legal proceeding." ABA Standards § 6.11. "Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding." ABA Standards § 6.12. The critical finding that separates disbarment from suspension under ABA Standard 6.1 is the attorney's mental state. ABA Standards § 6.12, Commentary. "Under ABA Standards 6.1—6.3, intentional misconduct warrants disbarment, knowing misconduct merits suspension, negligent misconduct justifies public censure, and an isolated instance of negligence calls for private admonition." *People v. Casias*, 279 P.3d 667, 679 (Colo. O.P.D.J. 2011); *People v. Vivarttas*, 139 P.3d 707, 709 (Colo. O.P.D.J. 2006) ("ABA Standards 6.1 and 6.2 each require a finding of intent, and the distinction between knowledge and intent is critical in imposing sanctions under the ABA Standards."). "Similarly, each of these standards suggests that disbarment is appropriate when misconduct causes serious injury or potential injury, suspension or public censure are proper when misconduct causes injury or potential injury, and private admonition is sufficient when misconduct causes little injury or potential injury." *Casias*, 279 P.3d at 679. Furthermore, a lawyer who disregards a court order and "engage[s] in multiple acts of misconduct . . . may find their sanctions elevated from suspension to disbarment." Annotated Standards at 337.

[¶143] Ms. Manlove's conduct in *State v. R.L.* demonstrates disregard for the rules of discovery and a court's criminal management order, which resulted in the dismissal of serious criminal charges against an alleged habitual criminal. She then intentionally misled the district court as to why she had not produced DNA test results which had been in her possession for more than two months. Additionally, Ms. Manlove intentionally misled the public with her press release in Criminal Action No. CR 2019-1739 by falsely stating the circuit court was closed. Lastly, we find Ms. Manlove's mass dismissal of approximately 400 criminal cases and drastic reduction in services to manage her backlog of cases caused significant injury as well as potential injury to the criminal justice system and the community as a whole.

[¶144] A lawyer who violates her duty of candor, prejudices the administration of justice, and engages in dishonest, deceitful, and misleading conduct "violate[s] the most fundamental duty of an officer of the court." ABA Standards § 6.11, Commentary. "The court and all parties before the court rely upon representations made by counsel . . . . [As such] an attorney's word is [her] bond." *Baker Indus., Inc. v. Cerberus, Ltd.*, 764 F.2d 204, 212 (3d Cir. 1985). "The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457–58 (4th Cir. 1993). We find disbarment is the presumptive sanction for Ms. Manlove's multiple violations of Rule 8.4(d) and the serious injury that resulted from her violations of the duties she owed to the legal system.

## IV. *Aggravating and Mitigating Factors*

[¶145] Before determining whether to impose the presumptive sanction of disbarment, we consider any relevant aggravating and mitigating circumstances. W.R.D.P. 15(b)(3)(C); W.R.P.D. 15(b)(3)(D)(iv); ABA Standards § 9.0. "[A]ggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed." ABA Standards § 9.21.

> Factors which may be considered in aggravation . . . include: (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution[;] (k) illegal conduct, including that involving the use of controlled substances.

ABA Standards § 9.22. "[M]itigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. ABA Standards § 9.31.

> Factors which may be considered in mitigation . . . include: (a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse [under certain circumstances]; (j) delay in disciplinary proceedings; (k) imposition of other penalties or sanctions; (l) remorse; (m) remoteness of prior offenses.

ABA Standards § 9.32.

**Aggravating Factors**

[¶146] We find the following aggravating factors in this matter: a pattern of misconduct; a

59

pattern of making dishonest, deceptive, and misleading statements; refusing to accept accountability and acknowledge the wrongful nature of her conduct and its prejudice to the criminal justice system; substantial experience in the practice of law; and the serious injury caused or potentially caused to the public, victims, defendants, law enforcement, and the Laramie County courts. Another aggravating factor, which the Hearing Panel did not consider, was Ms. Manlove's prior disciplinary record. Ms. Manlove stipulated to the admission of the diversion agreement she entered into with the Bar in July 2019. Ms. Manlove's conduct that led to the diversion agreement was similar to her conduct in mass dismissing several hundred cases. In that diversion agreement, Ms. Manlove conceded that when she took office, she hastily filed several motions to continue or vacate trials that were set to be tried soon after she took office "without the due diligence that should have been done before making the allegations contained in the motions." Ms. Manlove's conduct in continuing several matters immediately after she assumed office and her mass dismissal of approximately 400 cases, including on a matter where the defendant was already sentenced, shows a lack of diligence, lack of respect for the judicial system, and a lack of candor and transparency with the courts. Ms. Manlove agreed that she dismissed criminal cases with no known recourse for the average layperson. There is no way to quantify the amount of damage her conduct had on the criminal justice system and the public as a whole. This is a significant aggravating factor which calls into question her continued fitness to practice law.

[¶147] We find Ms. Manlove's continued claims that the disciplinary process and the report by the district court and circuit court judges were a coordinated effort to remove her from office lacked any basis in fact, and making those statements constitutes an additional aggravating factor. Ms. Manlove was interviewed by two news media outlets immediately before the disciplinary hearing. In those interviews, she stated there was "a very small group of people, seven judges and then the office of bar counsel, [trying] to supersede the will of the voters by removing [her] from office by virtue of bringing an ethics complaint." During the disciplinary hearing, Ms. Manlove testified the proceeding was the result of the seven judges trying to remove her from office; however, she testified she had not read all of the judges' depositions. Our review of the record yielded no evidence of any coordinated effort to remove Ms. Manlove from office. Instead, the record indicates the judges' actions were the result of their mandatory obligation to report Ms. Manlove's misconduct.

[¶148] Ms. Manlove told the press that she already knew "what the Board of Professional Responsibility's decision w[ould] be" because she had "no faith in the fairness of the system." Impugning the integrity of the disciplinary process violates an attorney's duty to "refrain from conduct unbecoming" an officer of the court. *In re Pyle*, 156 P.3d 1231, 1247, *reinstatement granted*, 163 P.3d 267 (Kan. 2007) (finding rules of professional conduct "can be violated . . . even if a legal proceeding has ended and even if the lawyer stops somewhere short of spreading outright lies[,]" and finding the lawyer violated the rules when he sent letters to people complaining the disciplinary process was "stacked against him"). We find Ms. Manlove's statements regarding the disciplinary process demonstrate

60

her lack of fitness to practice law and her inability to uphold the integrity of the legal system, which is another aggravating factor. *See id.*; *see also Lafond*, 2004 WY 51, ¶ 31, 89 P.3d at 334 (A prosecutor is obligated to serve the cause of justice and ascertain the truth).

**Mitigating Factors**

[¶149] Next, we consider any mitigating factors. The record establishes Ms. Manlove suffered two great losses in the fall of 2019 and the fall of 2020, which we find are mitigating factors. We find the chaos caused by the pandemic, coupled with budget cuts and the heavy caseload in Laramie County are additional mitigating factors. We also find there was evidence the previous administration left a stack of uncharged cases that contributed to the D.A. Office's backlog, which is another mitigating factor.

[¶150] Ms. Manlove took steps to improve her conduct after the judges sent their letter and the Bar initiated its investigation. The evidence in the record showed the employees who began working in the office in 2021 experienced a more positive work environment. We find Ms. Manlove's efforts to improve her conduct is a mitigating factor.

[¶151] Before addressing the appropriate sanction or sanctions for Ms. Manlove's Rule violations, we first address the additional issues she raised in her brief. We also address Ms. Manlove's objection to the costs recommended by the Hearing Panel.

## ADDITIONAL ISSUES RAISED BY MS. MANLOVE

[¶152] In her objection to the Hearing Panel's recommendation, Ms. Manlove raised two issues relating to the disciplinary proceeding. First, she challenges the appointment of a Hearing Panel Member. Second, she challenges the Hearing Panel's decision to admit Exhibit 9, her former office manager's notes, over her hearsay objection.

### I. Motion to Disqualify Hearing Panel Member

[¶153] Ms. Manlove argues the Hearing Panel Chairman should have disqualified himself because he is a member of the Board of Law Examiners, and he voted on a proposed temporary rule change submitted by the D.A.'s Office. She presents no argument that the Chairman was partial or biased.

#### A. Facts Relevant to Ms. Manlove's Motion for Disqualification

[¶154] On June 29, 2021, Ms. Manlove's disciplinary matter was assigned to three members of the BPR to act as a hearing panel. Retired District Court Judge Jeffrey A. Donnell was originally appointed to act as chair. Ms. Manlove moved for a peremptory

disqualification. The BPR granted Ms. Manlove's motion and appointed Christopher H. Hawks to act as chairman.

[¶155] Ms. Manlove subsequently filed a motion to disqualify Chairman Hawks, claiming "there exists a conflict of interest in Mr. Hawks serving as BPR Hearing Panel Chair . . . while at the same time serving as President-Elect of the [Wyoming State Bar], and that his service in such dual roles presents the strong appearance of impropriety, bias and prejudice[.]" Special Bar Counsel objected and argued there is nothing that prohibits a hearing panel member from simultaneously serving on the BPR and the Bar's Board of Officers and Commissioners. The Hearing Panel denied Ms. Manlove's motion and found she "fail[ed] to articulate any factual basis to suggest [Chairman Hawks was] biased in favor of the [O]ffice of Bar Counsel or Special Bar Counsel or otherwise [could not] be fair and impartial in chairing [the] proceedings."

[¶156] After hearing testimony during the disciplinary hearing, Chairman Hawks realized he previously voted on a proposed rule change from the D.A.'s Office when he was on the Board of Law Examiners. The proposed rule change was prompted by the employee shortage in the D.A.'s office. The rule change would have allowed an attorney whose admission was pending to temporarily practice law under the supervision of a licensed attorney.[18] Chairman Hawks on his own accord placed the following on the record:

> [Chairman Hawks]: Mr. Melchior, as a point of order, I need to now go on the record and make a record of something. You brought up the fact that I am on the Board of Law Examiners and got into the record that I was on the Board of Law Examiners when Ms. Manlove's petition for temporary practice was presented to the Character and Fitness Committee and Board of Law Examiners.
>
> I need the record to reflect that the Board of Law Examiners, myself included, did meet. We did consider the issue. There was a significant amount of discussion on the issue. That meeting was on March 8th of 2021, when the proceedings against Ms. Manlove were still confidential.
>
> At the hearing -- there was a joint hearing of the Board of Law Examiners and the Character and Fitness Committee where there was a recommendation from bar counsel to not approve the motion for -- or the application for temporary practice, and

---

[18] Ms. Manlove never petitioned this Court for the proposed rule change, which she could have done despite the Board of Law Examiners vote. *See generally* General Order 17-01, Wyoming Supreme Court (June 15, 2017).

there was a unanimous vote of the committee and the board to deny the request.

But I want the record to be very clear at no time during the meeting, which was on March 8, [2021], was anything about the proceedings against Ms. Manlove mentioned to that board. The petition was considered, and it was denied wholly on the merits of the petition and nothing to do with the charges that were then being investigated to dismiss Manlove.

[Mr. Melchior]: Mr. Chairman, I really appreciate you stating that and in the detail that you did. And if I heard you correctly, that would -- that would have been before the Formal Charge, so as you previously indicated, you would have no knowledge of any investigation or anything of that nature.

\* \* \*

[Chairman Hawks]: I can tell you in my experience -- so Mr. Gifford acts as counsel to the Board of Law Examiners, and Sharon Wilkinson is the director for the Board of Law Examiners. So whenever we meet, as is common on any board, board will ask staff if they have a recommendation.

And in that meeting, we had a specific request to Mr. Gifford if he thought we should approve or deny the application. And without comment -- without comment, he recommended that it be denied. Notwithstanding, I believe the board and the Character and Fitness Committee engaged in discussion about the merits of the actual application on its face for well over an hour.

\* \* \*

[Mr. Melchior]: Thank you, Mr. Hawks. I very much appreciate your explanations.

## B. Ms. Manlove Waived any Argument Regarding Disqualification

[¶157] In *Mendicino v. Whitchurch*, we took no exception to the statement: "Courts can hold that a system calling for adjudication by officers who are disqualified is a denial of due process of law." 565 P.2d 460, 471 (Wyo. 1977). We further recognized a lawyer in a disciplinary proceeding can request to disqualify a member of the administrative or special

tribunal. *Id.* at 472–73. "[A] purported disqualification of a [Hearing Panel Member] may be waived by the respondent." 7A C.J.S. *Attorney & Client* § 130 (Nov. 2022 Update); *In re Trask*, 380 P.2d 751, 760 (Haw. 1963) ("[T]he matter of . . . disqualification [in a disciplinary hearing] presents no jurisdictional question" and therefore the objection is one that can be waived). The right to challenge an appointment of a hearing panel member requires "promptly raising the claim of bias on the part of the panel or a member thereof and then raising the question in the review proceedings." *Mendicino*, 565 P.2d at 472.

[¶158] While Ms. Manlove filed a motion to disqualify Chairman Hawks in the proceedings below, that motion presented a different argument than that which is before this Court on review. The potential conflict was disclosed by Chairman Hawks before Special Bar Counsel rested his case. Ms. Manlove made no objection or request to recuse or disqualify Chairman Hawks when he placed on the record his participation in reviewing the temporary rule change. Instead, Ms. Manlove continued with the presentation of her case. We find Ms. Manlove was given the opportunity to request disqualification during the disciplinary hearing, but she chose not to do so and continued with the proceeding. Her actions expressly indicate a willingness to proceed notwithstanding the fact Chairman Hawks voted on the temporary rule change. Under these circumstances, we find Ms. Manlove waived any argument that Chairman Hawks should have been disqualified or that she was prejudiced by him sitting on the Hearing Panel. *See In re Trask*, 380 P.2d at 761 (finding the respondent was given an opportunity during the hearing to raise the issue of disqualification but since he failed to do so, the argument was waived); *Disciplinary Couns. v. Baumgartner*, 796 N.E.2d 495, 505 (Ohio 2003) (finding an objection to the chairperson's appointment was waived because the respondent declined to request recusal after the chairperson disclosed the conflict).

[¶159] Furthermore, we found no evidence in the record that Chairman Hawks acted with bias prior to or during the hearing. Ms. Manlove testified she did not believe Chairman Hawks had a personal bias against her.

> [Chairman Hawks]: Do you have any reason to believe that any of these Panel members, myself included, have a personal bias or personal animus toward you?
>
> [Ms. Manlove]: No, sir. I think it would be accurate to say I don't really know any of you.
>
> [Chairman Hawks]: Thank you.
>
> [Ms. Manlove] And probably you don't -- none of you really could say that you know me either.
>
> [Chairman Hawks]: Precisely the same.

Ms. Manlove, in your motion to disqualify me as a hearing panel member, you referenced the fact that I'm the incoming president of the Wyoming State Bar, which is true. And in that capacity I am a member of the officers and -- or I'm a member of the executive committee.

I want the record to reflect and I want you to know that, in my capacity -- I mean, in that capacity as president-elect, being on the executive committee and being a member of the Board of Law Examiners since 2010 or '11 it's been, I have specific -- the second I was appointed to your Panel, I specifically implemented an ethical screen that nobody in the Wyoming State Bar is to discuss your case with me under any circumstances. Do you understand that?

[Ms. Manlove]: I do now and I appreciate that explanation.

[Chairman Hawks]: I hope you believe me because I take this very seriously. And when it is suggested that I'm not fair or impartial, it is offensive, and I really take it to heart. . . . I know nothing about you or this case. So I want the air to be clear on that.

[Ms. Manlove]: Thank you.

[¶160] The Hearing Panel acts as an arm of this Court by taking evidence and making findings and recommendations, but the ultimate judgment is vested in this Court and we "must independently pass upon all evidence and reach [our] independent judgment." *Stinson*, 2014 WY 134, ¶ 29, 337 P.3d at 409; *Mendicino*, 565 P.2d at 473. A respondent in a disciplinary proceeding "is well protected from capricious, arbitrary or prejudicial findings by the [hearing panel]." *Mendicino*, 565 P.2d at 473. We, therefore, presume a fair hearing was held, and find Ms. Manlove waived any objection to Chairman Hawks' continued participation in the proceedings. *See generally Mendicino*, 565 P.2d at 473 ("Without minimizing the importance of a fair hearing before a fair tribunal, and in the absence of a record showing at least a minimal factual basis for reasonable claim of bias or prejudice, we cannot and will not presume that a fair hearing was not held."); *Brown v. State*, 816 P.2d 818, 824 (Wyo. 1991) ("We have held that the *bias* which is the grounds for disqualification must be personal and it must render the judge unable to exercise his function impartially in a given case or which is inconsistent with a state of mind fully open to the conviction which evidence might produce. A judge has a duty not to recuse himself without a valid reason").

65

## II.    *Objection to Special Bar Counsel's Exhibit 9*

[¶161] Over Ms. Manlove's objection, the Hearing Panel received Special Bar Counsel's Exhibit 9, which consists of notes created and kept by the former office manager during her employment with the D.A.'s Office.  Ms. Manlove argues the Hearing Panel "improperly admitted into evidence [Exhibit 9] on the grounds that such exhibit satisfied the 'business records' exception to the hearsay rule."  Special Bar Counsel claims the records were properly admitted under Wyoming Rule of Evidence ("W.R.E.") 803(6) because they were notes documenting personnel matters and were made as part of the regular course of business.

[¶162] "The Wyoming Rules of Evidence generally apply to disciplinary hearings." *Hinckley*, 2022 WY 18, ¶ 96, 503 P.3d at 619 (citing W.R.D.P. 15(b)).  "Hearsay statements are generally inadmissible because they are made outside of court and, therefore, presumed to be unreliable." *Blair v. State*, 2022 WY 121, ¶ 18, 517 P.3d 597, 601 (Wyo. 2022); W.R.E. 802.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c).  Written notes prepared by a former legal assistant or employee constitute hearsay and cannot be received into evidence unless the notes fall within a recognized exception to the hearsay rule. *Meyer v. Norman*, 780 P.2d 283, 292 (Wyo. 1989).

[¶163] The office manager's written notes were admitted under the business records exception in W.R.E. 803(6), which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> *    *    *
>
> (6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by a certification that complies with Rule 902(a)(11) through (14) or with a statute or other court rule permitting certification; or the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.  The term

"business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit[.]

[¶164] We have previously discussed what must be shown for a document to be admissible under W.R.E. 803(6):

[T]he proponent of the memorandum, report, record, or data compilation must provide testimony by a qualified witness demonstrating (1) the memorandum, report, record, or data compilation was made at or near the time of the event, (2) by a person with knowledge or from information transmitted by a person with knowledge, (3) if kept in the course of a regularly conducted business activity, and (4) if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation.

*Blair*, 2022 WY 121, ¶ 26, 517 P.3d at 603–04 (quoting W.R.E. 803(6); *Alloway v. RT Cap., Inc.*, 2008 WY 123, ¶ 15, 193 P.3d 713, 718 (Wyo. 2008) (internal quotations omitted).

[¶165] The former office manager testified she "was responsible for supervision of all nonexempt staff or nonattorney [sic] staff . . . with the exception of the internal investigator. [She] was also the human resource representative for the office and . . . handled the business matters, such as paying bills, time sheets, [etc.]" Early in her position, the former office manager began "making contemporaneous notes of [her] observations of office activities." She kept the notes in the course of her position because Ms. Manlove "expressed the significance of documenting everything that was personnel related" and because as a supervisor and human resource representative, it was an essential part of her position. The notes are separated by employee and contain entries documented by day from January 2019 until November 2019. The notes often document conversations with third parties working outside the D.A.'s Office, such as judicial assistants, law enforcement, and defense counsel. The notes also include email correspondence between employees of the D.A.'s Office and other third parties working outside D.A.'s Office.

[¶166] Ms. Manlove contends that each of the statements in the notes required Special Bar Counsel to meet a separate exception to the hearsay rule because many of the notes are essentially hearsay within hearsay. We agree and find the Hearing Panel erred by admitting Exhibit 9 in its entirety. Statements by third parties employed outside the office are not admissible to prove the truth of the declarations of the third party because they are out-of-court statements of someone other than the person whose records are under consideration. *Seaton v. State of Wyo. Highway Comm'n, Dist. No. 1*, 784 P.2d 197, 200 (Wyo. 1989). Stated succinctly, those assertions of a third-party other than the former office manager are

double hearsay or "hearsay within hearsay." *United States v. Blechman*, 657 F.3d 1052, 1065 (10th Cir. 2011) ("Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person."). Under W.R.E. 805: "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." In other words, the information or statement provided by a third party who works outside the business preparing the record must fall within its own hearsay exception to be admissible. *Griggs v. State*, 2016 WY 16, ¶ 121, 367 P.3d 1108, 1142 (Wyo. 2016); 2 *McCormick on Evidence* § 324.1 (8th ed. July 2022 Update).

[¶167] For the statements of the former office manager and the third party working outside the D.A.'s Office to be admissible under the business records exception, both parties must be "acting in the routine of the business." 2 *McCormick on Evidence* § 324.1 (8th ed. July 2022). While here the third party was presumably acting in the routine of business, there was no foundation or verification laid during the hearing to prove this. We decline to assume each third party was acting in the routine of business to meet the business records exception and find the Hearing Panel erred by admitting Exhibit 9 in its entirety without first ensuring each third-party statement met a hearsay exception on its own. *See generally Blechman*, 657 F.3d at 1066 (noting that information provided by a person outside the business could be received under the exception if someone in the business verified or assured the accuracy of that information and ruling that the record offered was inadmissible for failure to provide that verification); 2 *McCormick on Evidence* § 324.1; 2 *McCormick on Evidence* § 290 (8th ed. July 2022 Update).

[¶168] Although the Hearing Panel erred in admitting exhibit 9 in its entirety, we find the error did not prejudice Ms. Manlove. Given our standard of review, this Court reviewed each alleged Rule violation without considering exhibit 9 or its related evidence. We reached our own independent judgment, and our decision in this matter is supported by other competent, admissible evidence in the record. *See generally Stinson*, 2014 WY 134, ¶ 29, 337 P.3d at 409 ("[T]he ultimate judgment in these cases is vested in the Court."); *Werner v. State Bar*, 150 P.2d 892, 899 (Cal. 1944) ("Legal evidence alone should be required to deprive a duly admitted attorney of the vitally important and valuable right to practice his profession, and to impose upon him the stigma of disbarment. The court can be asked in such review only to consider the sufficiency of legal evidence."); *Matter of Seck*, 949 P.2d 1122, 1127 (Kan. 1997) ("While [the] admission [of hearsay evidence] affects some of the panel's findings, the admission does not deny the respondent substantive due process of law. Other competent evidence of record supports the ultimate conclusion of the panel.").

## COSTS AND FEES

[¶169] When a public discipline, such as disbarment, is recommended, "the Court may assess all or any part of the certified costs, together with the administrative fee, against

respondent." W.R.D.P. 25(e). Under ABA Standard 2.8, other sanctions and remedies include the assessment of costs, which "the court . . . may impose when it is deemed necessary to carry out the goals of the disciplinary system." ABA Standards § 2.8., Commentary. The Hearing Panel recommended Ms. Manlove pay an administrative fee of $3,000.00 ($750.00 for each bar complaint filed in Docket Nos. 2020-108, 2021-005, 2021-039 and 2021-062) and reimburse the Wyoming State Bar for the certified costs of the proceeding.

[¶170] The Affidavit of Costs summarized the costs of the proceeding as follows:

- Hearing Rough Draft Transcripts     $1,543.00
- Hearing Reporting Fees and Transcription Expenses     $12,882.75
- Little America: Lodging, Meals, Meeting Space, and A/V     $64,635.75
- Board Members Additional Mileage, Lodging and Meals     $2,803.18
- Special Bar Counsel: Investigation and Hearing Expenses:     $9,332.28
  TOTAL:     $91,196.96

The costs for transcripts, reporting fees, and Special Bar Counsel's investigation and hearing expenses do not surprise this Court given the extensive record in this matter. Ms. Manlove's response to the first formal charge alone was more than 350 pages with the total filings in the disciplinary proceeding amounting to almost 1,500 pages. Ms. Manlove listed 69 witnesses in her pretrial memorandum, issued over 30 subpoenas, and requested to take more than 20 depositions. The parties stipulated to the admission of several of those depositions. The disciplinary hearing took eight days, and Ms. Manlove was provided with daily hearing transcripts for her expert witness. Ms. Manlove admitted more than 2,000 pages of exhibits, and Special Bar Counsel admitted approximately 1,500 pages of exhibits.

[¶171] Ms. Manlove's expert witness summarized the volume of material best when he stated:

> [MS. MANLOVE'S EXPERT]: . . . . The volume of paper --
> I'm a criminal lawyer. The volume of paper which you have
> given me is overwhelming, so I believe I have everything, and
> I recall reading in the transcript of the judges talking about an
> exploding binder. That's been my life with this case.

With this in mind, we order Ms. Manlove to reimburse the Wyoming State Bar $23,758.03 in costs for the transcription expenses and Special Bar Counsel's investigation and hearing expenses.

[¶172] With respect to the lodging, mileage and food expenses, the costs appear appropriate. However, the cost for the use of the banquet room with catering at $59,877.92 causes us concern. The cost of the room was $1,200 a day with an AV Package of $900

per day and a wireless internet cost of $825 per day.[19]  We are concerned the Bar did not use a State-owned building to minimize any costs it would request Ms. Manlove to repay.

[¶173] Therefore, in addition to the transcription, reporting and Special Bar Counsel's fees ordered above ($23,758.03), we will impose on Ms. Manlove an additional $7,152.18, which covers the cost of the lodging ($4,349.00) and additional mileage and food for the Hearing Panel and Special Bar Counsel ($2,803.18).  With respect to the administrative fee, we impose on Ms. Manlove a fee of $1,500 instead of the $3,000 recommended by the Hearing Panel.  This represents an administrative fee of $750 for each of the two dockets we found Rule violations (BPR docket numbers 2020-108 and 2021-062).  We decline to impose an administrative fee for the two dockets where we did not find a Rule violation (BPR 2021-005 and 2021-039).  Therefore, the total amount of costs Ms. Manlove is liable for is $32,410.21.  W.R.D.P. 25(b), (e).  She shall not be liable for any additional costs.

## DISCIPLINARY ORDER

[¶174] "The responsibility of this Court in disciplinary proceedings is not to punish, but to determine a lawyer's fitness to practice law for the protection of the public, the courts and the legal profession." *Hinckley*, 2022 WY 18, ¶ 99, 503 P.3d at 620.  "Protection of the public squares with the notion that a license to practice law is neither a right nor an entitlement, but a privilege conferred on the lawyer primarily for the benefit of the public." Annotated Standards at 4.  "The privilege of practicing law carries with it the obligation to be worthy of the public's trust and confidence." Annotated Standards at 5.  A lawyer's obligation is "to uphold and protect the Rule of Law." Davis, Ret. J., *A Few Parting Words*, Wyoming Lawyer, 14 (Feb. 2022) (citing Judge Learned Hand).  If a lawyer fails to uphold the Rule of Law and protect the legal system upon which it is enforced, this conduct can jeopardize the Spirit of Liberty and engender a disrespect for the judicial system and a government of laws. *Id.*

[¶175] Applying the ABA Standards, the presumptive sanction for Ms. Manlove's conduct is disbarment. ABA Standards § 5.11, Commentary; Annotated Standards at 255 ("[I]ntentional conduct involving dishonesty, fraud, deceit or misrepresentation seriously, adversely reflect on a lawyer's fitness to practice law and thus warrant disbarment[.]").  Considering the aggravating and mitigating circumstances, the number of Rule violations, the severity of the Rule violations, Ms. Manlove's pattern of conduct and pervasive dishonesty, the effects of Ms. Manlove's conduct on the legal profession and the criminal justice system, and her state of mind, we conclude disbarment is the proper sanction.  Ms. Manlove's conduct and lack of candor places her continued fitness to practice law into serious question and does not allow for any sanction short of disbarment.  We, therefore, disbar Ms. Manlove from the practice of law in Wyoming, which shall take effect at the close of business May 5, 2023.  Pursuant to Rule 25 of the Wyoming Rules of Disciplinary

---

[19] We note the Hearing Panel denied Ms. Manlove's request to live stream the proceedings.

Procedure, Ms. Manlove shall reimburse the Wyoming State Bar the amount of $23,758.03 for costs incurred in handling this matter, $7,152.18 for costs of lodging, mileage and meals for the Hearing Panel and Special Bar Counsel, and pay an administrative fee of $1,500. Ms. Manlove shall pay the total amount of $32,410.21 to the Wyoming State Bar on or before June 1, 2023. If Ms. Manlove fails to make payment in the time allotted, execution may issue on the award. So ordered.